IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF HAWAII

|  |  |
|---|---|
| ELIZABETH A. KANE, BANKRUPTCY TRUSTEE; AIR LINE PILOTS ASSOCIATION, INTERNATIONAL, HAWAII TEAMSTERS AND ALLIED WORKERS, LOCAL 996, | CIVIL NO. 19-00574 JAO-RT<br>CIVIL NO. 20-00246 JAO-RT |
| Plaintiffs, | **ORDER GRANTING IN PART AND DENYING IN PART DEFENDANTS' MOTIONS TO EXCLUDE VARIOUS EXPERT TESTIMONY (ECF NOS. 59–62, 66), AND GRANTING IN PART AND DENYING IN PART PLAINTIFFS' MOTION TO STRIKE (ECF NO. 102)** |
| vs. | |
| PACAP AVIATION FINANCE, LLC, PACIFICCAP INVESTMENT MANAGEMENT, LLC, MALAMA INVESTMENTS, LLC, SNOWBIZ VENTURES, LLC, PACAP MANAGEMENT SOLUTIONS, LLC, PACAP ADVISORS, LLC, JEFFREY AU, JACK TSUI, JACK CHUCK SHE TSUI TRUST, LAWRENCE INVESTMENTS, LLC, LAWRENCE J. ELLISON REVOCABLE TRUST, OHANA AIRLINE HOLDINGS, LLC, CARBONVIEW LIMITED, LLC, PAUL MARINELLI, LAWRENCE J. ELLISON, CATHERINE YANNONE, CHRISTOPHER GOSSERT, | |
| Defendants. | |

**ORDER GRANTING IN PART AND DENYING IN PART DEFENDANTS'
MOTIONS TO EXCLUDE VARIOUS EXPERT TESTIMONY (ECF NOS.
59–62, 66), AND GRANTING IN PART AND DENYING IN PART
PLAINTIFFS' MOTION TO STRIKE (ECF NO. 102)**

Plaintiffs Elizabeth A. Kane, the Chapter 7 trustee ("Trustee") in the

underlying bankruptcy case commenced by Debtor Hawaii Island Air, Inc. ("Island

Air" or the "Debtor"); Air Line Pilots Association, International; and Hawaii

Teamsters and Allied Workers, Local 996 (collectively, the "Unions," and with the

Trustee, "Plaintiffs") initiated an adversary proceeding in the United States

Bankruptcy Court for the District of Hawaii on August 12, 2019.  *See Kane v.

PaCap Aviation Finance, LLC*, AP No. 19-90027 (Bankr. D. Haw.) ("AP"), ECF

No. 1.  The reference was withdrawn on November 20, 2019.  ECF No. 6.

Before the Court are various motions seeking to exclude Plaintiffs' experts'

testimonies and reports.  Defendants PaCap Aviation Finance, LLC; PaCap

Management Holdings, LLC; PacifiCap Investment Management, LLC; Malama

Investments, LLC; SnowBiz Ventures, LLC; PaCap Management Solutions, LLC;

PaCap Advisors, LLC; PacifiCap Management, Inc.; Jeffrey Au ("Au"); Jack

Cheuk She Tsui Revocable Living Trust; and Jack Tsui (collectively, the

"Malama-Related Defendants") move to exclude certain portions of the expert

report, rebuttal report, testimony, and opinions of James Duca ("Duca"); the expert

rebuttal report, testimony, and opinions of Mark Kahan ("Kahan"); certain portions

of the expert report, testimony, and opinions of Scott C. Gibson ("Gibson"); and

2

the expert report, testimony, and opinions of Elizabeth Newlon ("Newlon"). *See* ECF No. 66-1.

Defendants Lawrence Investments LLC; Paul Marinelli and Lawrence J. Ellison, as co-trustees of the Lawrence J. Ellison Revocable Trust; Ohana Airline Holdings, LLC; Carbonview Limited, LLC; Paul Marinelli ("Marinelli"); and Lawrence J. Ellison (collectively, the "Ohana-Related Defendants") move to exclude certain portions of the expert report and the entirety of the supplemental report of Daniel Bowen ("Bowen"), *see* ECF No. 59; the expert reports and testimony of Gibson, *see* ECF No. 60; the expert reports and testimony of Duca, *see* ECF No. 61; and the expert reports and testimony of Newlon, *see* ECF No. 62.

Plaintiffs move to strike certain portions of the Ohana-Related Defendants' replies. *See* ECF No. 102.

For the following reasons, the Court grants in part and denies in part the various motions to exclude expert testimony, and grants in part and denies in part the motion to strike.

## I.   BACKGROUND

### A.   Facts

This is a complex case involving multiple parties and claims. The complaint is over 100 pages long and the parties have vigorously litigated various issues. Because the parties and the Court are familiar with the underlying facts and

3

allegations, the Court only provides a brief and simplified overview of the relevant background.

This case stems from the shutdown and bankruptcy of the now-defunct Island Air, a Delaware corporation. *See* AP ECF No. 1 (Complaint). The Ohana-Related Defendants were the sole owners of Island Air from 2013 to February 2016 when they sold a controlling two-thirds interest to the Malama-Related Defendants. *Id.* at 7, 13. Marinelli was on the board of Island Air from the date of the Ohana-Related Defendants' purchase of the airline to July 2017. *See id*. at 8, 64; *see also* ECF No. 75-3 at 6–8 (describing Marinelli's roles within the Ohana-Related Defendant entities, including as a board member of Island Air). Though Au could have appointed himself a director of Island Air through his alleged control of the Malama-Related Defendants, he elected two other people for the positions. *See id.* at 17.

The Trustee alleges that "the self-interested acts of its owners" are to blame for Island Air's bankruptcy and that if the owners had acted in the best interests of the company, the bankruptcy "would not have occurred when it did (if it occurred at all), the outstanding debts would not have been as substantial as they are, and there would be additional assets to satisfy those debts." *Id.* at 9. In essence, the Trustee claims that Defendants violated their fiduciary duties to Island Air by keeping it on life support for personal or other improper motives — thereby

4

depleting its assets — rather than shutting it down.  *See id.* at 9–12; *see also id.* at 88–103 (detailing the Trustee's breach of fiduciary duty claims).

Island Air filed for Chapter 11 bankruptcy on October 16, 2017 and ceased operations on November 10, 2017.  *See id.* at 75–76.[1]  It was only on November 9, 2017 that the employees of Island Air were informed that the next day would be the company's last.  *See id.* at 78.  From this, the Unions asserted three causes of action pursuant to Hawaii's Displaced Workers Act ("DWA"), Hawaiʻi Revised Statutes ("HRS") ch. 394B, and the federal Worker Adjustment and Retraining Notification Act ("WARN Act"), 29 U.S.C. § 2101.  *See id.* at 81–94.

## B.    Procedural History

Defendants filed their instant motions to exclude on February 23, 2022.  *See* ECF Nos. 59–62, 66.  Plaintiffs filed their oppositions on March 9, 2022, and errata to the oppositions on March 10 and 16, 2022.  *See* ECF Nos. 75, 77–80, 83, 88.  The Court then set the motions for a hearing on July 8, 2022 and set a reply deadline of May 13, 2022.  Defendants filed their replies on that date.  *See* ECF Nos. 95–99.

Plaintiffs then moved to strike portions of certain replies.  *See* ECF No. 102. The Court allowed a response, which the Ohana-Related Defendants filed on June

---

[1]  The Chapter 11 Bankruptcy was converted to a Chapter 7 proceeding on November 15, 2017.  AP ECF No. 1 at 26.

30, 2022, *see* ECF No. 106, and Plaintiffs filed a reply in support of their motion to strike on July 5, 2022, *see* ECF No. 107.

## II.   LEGAL STANDARD

Federal Rule of Evidence ("FRE") 702 governs the admissibility of expert evidence.  *See Clausen v. M/V New Carissa*, 339 F.3d 1049, 1055 (9th Cir. 2003). Experts may offer opinions based on their "knowledge, skill, experience, training, or education" if these requirements are met:  (1) "the expert's scientific, technical, or other specialized knowledge will help the trier of fact to understand the evidence or to determine a fact in issue"; (2) "the testimony is based on sufficient facts or data"; (3) "the testimony is the product of reliable principles and methods"; and (4) "the expert has reliably applied the principles and methods to the facts of the case." Fed. R. Evid. 702.

The admissibility of expert reports is evaluated under *Daubert v. Merrell Dow Pharmaceuticals, Inc.*, 509 U.S. 579 (1993).  "Under *Daubert*, 'the district court judge must ensure that all admitted expert testimony is both relevant and reliable.'"  *Grodzitsky v. Am. Honda Motor Co.*, 957 F.3d 979, 984 (9th Cir. 2020) (quoting *Wendell v. GlaxoSmithKline LLC*, 858 F.3d 1227, 1232 (9th Cir. 2017)). "Expert opinion testimony is relevant if the knowledge underlying it has a valid connection to the pertinent inquiry.  And it is reliable if the knowledge underlying it has a reliable basis in the knowledge and experience of the relevant discipline."

6

*Primiano v. Cook*, 598 F.3d 558, 565 (9th Cir. 2010) (internal quotation marks and footnote omitted). The Court's gatekeeping function extends to all expert testimony. *See Kumho Tire Co. v. Carmichael*, 526 U.S. 137, 147 (1999). "The inquiry is flexible and Rule 702 should be applied with a liberal thrust favoring admission." *Wendell*, 858 F.3d at 1232 (internal quotation marks and citations omitted).

## A.    Reliability

District courts have broad latitude in determining reliability and deciding how to determine reliability. *See Hangarter v. Provident Life & Acc. Ins. Co.*, 373 F.3d 998, 1017 (9th Cir. 2004). The following nonexclusive factors bear on the reliability of a particular scientific theory or technique: "(1) whether the theory can be and has been tested, (2) whether the theory has been peer reviewed and published, (3) what the theory's known or potential error rate is, and (4) whether the theory enjoys general acceptance in the applicable scientific community." *Murray v. S. Route Mar. SA*, 870 F.3d 915, 922 (9th Cir. 2017) (citing *Daubert*, 509 U.S. at 593–94). District courts need not "examine factors that are not 'reasonable measures of reliability in a particular case.'" *Id.* (citation omitted).

"'The focus of the district court's analysis must be solely on principles and methodology, not on the conclusions that they generate,' and 'the court's task is to analyze not what the experts say, but what basis they have for saying it.'"

7

*Grodzitsky*, 957 F.3d at 984–85 (citation omitted); *see also Daubert*, 509 U.S. at 592–93. The district court's function is to "screen the jury from unreliable nonsense opinions, but not exclude opinions merely because they are impeachable." *Alaska Rent-A-Car, Inc. v. Avis Budget Grp., Inc.*, 738 F.3d 960, 969 (9th Cir. 2013).

## B.    Relevance

"[R]elevance means that the evidence will assist the trier of fact to understand or determine a fact in issue." *Cooper v. Brown*, 510 F.3d 870, 942 (9th Cir. 2007) (citing *Daubert*, 509 U.S. at 591–92). That is, "[t]he evidence must logically advance a material aspect of the party's case." *Id.* (citing *Daubert v. Merrell Dow Pharms., Inc.*, 43 F.3d 1311, 1315 (9th Cir. 1995)). The district court "is not tasked with deciding whether the expert is right or wrong, just whether his testimony has substance such that it would be helpful to a jury." *Alaska Rent-A-Car*, 738 F.3d at 969–70. A court's gatekeeping inquiry "must be tied to the facts of a particular case." *Cooper*, 510 F.3d at 942 (some internal quotation marks and citations omitted).

## III.    DISCUSSION

## A.    Motion To Strike

Pursuant to Local Rule 7.2, Plaintiffs move to strike or disregard portions of the Ohana-Related Defendants' reply briefs in support of their motions to exclude

Bowen, Duca, and Gibson.  *See* ECF No. 102.  Local Rule 7.2 provides that "[a] reply must respond only to arguments raised in the opposition.  Any argument raised for the first time in the reply shall be disregarded."  LR7.2.

       1.      <u>Section III Of The Bowen Reply Brief</u>

Plaintiffs ask the Court to disregard Section III of the Ohana-Related Defendants' reply brief in support of their motion to exclude Bowen.  *See* ECF No. 102 at 7–9; *see also* ECF No. 97 (Bowen Reply).  Plaintiffs contend that the arguments in that section are raised for the first time in reply and do not respond to any arguments in their opposition.  *See* ECF No. 102 at 7–9.

In Section III of the Bowen Reply, the Ohana-Related Defendants argue that Bowen would not have approved of Duca's use of his calculations of the decline in net worth and increase in liabilities as reliable measures of damages.  *See* ECF No. 97 at 13–16.  They also argue that Bowen knew that his calculations were unreliable because they were based on the "book value" of Island Air's assets as shown in its financial reports, as opposed to fair market value.  *Id.* at 16–18.

The Court will not disregard the arguments in the Bowen Reply.  Bowen's and Duca's testimonies are related because Plaintiffs employ a dual experts arrangement whereby Bowen and Duca take on different roles to expound on damages.  Duca is a bankruptcy attorney who seeks to "opine[] on the methodology for calculating damages resulting from breaches of fiduciary duty,"

ECF No. 88-4 at 10, while Bowen is an accountant that compiled the financial data underlying Duca's proposed theory of damages, *see id*.

Plaintiffs argued that decline in net value and increase in liabilities are proper measures of damages in this case in their opposition to the Ohana-Related Defendants' motion to exclude Duca. *See* ECF No. 78 (Duca Opposition) at 18–27. Because Duca relied on Bowen to provide the underlying numbers for his assertion of the proper measure of damages, and because Plaintiffs argued that point in the Duca Opposition, the Court concludes that the portion of Section III of the Duca Reply, ECF No. 98, that discusses whether an increase in liabilities or decline in net worth are reliable proxies for damages is sufficiently responsive to Plaintiffs' brief. In other words, Bowen's views about whether decline in net worth or increase in liabilities are reliable measures of damages is relevant to rebut arguments in the Duca Opposition.

The Ohana-Related Defendants also discussed Bowen's use of book value as opposed to fair market value in Section III of the Bowen Reply. Notably, in opposition to the Ohana-Related Defendants' motion to exclude Bowen, Plaintiffs argued that Bowen's supplemental report was actually a rebuttal because:

> Mr. Duca originally calculated damages, using accounting data provided by Mr. Bowen, based on book value of assets. When defense experts criticized that approach and said that fair market value would need to be used, Mr. Duca had Mr. Bowen provide him with information to attempt the calculations based on fair market value.

ECF No. 75 at 26 (citations omitted).  Thus, Plaintiffs raised the issue of fair

market value versus book value in their opposition and the Ohana-Related

Defendants' response in reply is acceptable.

The Court DENIES Plaintiffs' motion to strike as to this section.

2.    Section II Of The Duca Reply

Plaintiffs also move to strike Section II of the Ohana-Related Defendants'

reply in support of their motion to exclude Duca, again contending that it launches

new arguments that should have been raised in the motion itself.  *See* ECF No. 102

at 10–12.  In that section, the Ohana-Related Defendants argue that Duca's

opinions about the proper measure of damages are inadmissible legal opinions.

*See* ECF No. 98 at 8–10.  In Duca's expert report, he stated that was "not offering

an opinion on what the law is" relating to damages.  *See* ECF No. 61-2 at 2.  But

Plaintiffs' opposition to the Duca motion states that Duca would "opine on the

measure of damages for breach of fiduciary duty claims for a company that went

into bankruptcy and shut down."  ECF No. 88-4 at 7.  Duca, Plaintiffs contend,

also has "specialized knowledge regarding the proper methodology for determining

damages for a breach of fiduciary duty claim, *i.e.*, change in net worth or increase

in liabilities."  *Id.* at 8.  Plaintiffs' references to Duca testifying as to the correct

method or measure of calculating damages opens the door to the Ohana-Related

Defendants' argument that the opinions stray into legal opinions.  The Court thus DENIES Plaintiffs' motion insofar it targets Section II of the Duca Reply.

> 3.     Section III Of The Duca Reply

In Section III of their reply in support of their motion to exclude Duca, the Ohana-Related Defendants argue that Duca's opinions about the proper measure of damages are inadmissible because they are based on the incorrect legal theory that Marinelli had a fiduciary duty to shut down the Debtor.  *See* ECF No. 98 at 10–13. Plaintiffs contend that this argument was improperly raised for the first time in reply.  *See* ECF No. 102 at 12–15.  But in their motion to exclude Duca, the Ohana-Related Defendants argued that Duca's proposed measure of damages was unreliable because "courts frequently reject breach of fiduciary duty claims premised on the notion that a director's conduct led to an increase in outstanding liabilities."  *See* ECF No. 61 at 14–15 (citations omitted).  While the reply's discussion of whether a fiduciary may have a duty to shut down an insolvent business is more robust, the Court views it as an extension of Ohana-Related Defendants' argument in their motion.  The Court thus DENIES the motion to strike as to the foregoing.

> 4.     Section I.B.4 Of The Gibson Reply

In Section I.B.4 of their reply in support of their motion to exclude Gibson, the Ohana-Related Defendants urge the Court to exclude Gibson's opinions about

events occurring after July 10, 2017 because Marinelli resigned on that date and no longer owed any fiduciary duty to Island Air.  *See* ECF No. 96 (Gibson Reply) at 15–17.  The Court GRANTS Plaintiffs' motion to strike as to this argument.  The Ohana-Related Defendants did not raise the issue in their motion or any other related motion, and Plaintiffs' oppositions only tangentially refer to events after July 10, 2017.

**B.   Duca**

Duca is Plaintiffs' proffered expert on damages on the breach of fiduciary duty claims.  *See* ECF No. 61-2.  Plaintiffs also assert that Duca is an expert qualified to opine "on financial terms affecting corporations, particularly distressed corporations."  ECF No. 88-4 at 10; *see id.* at 29.  Both the Ohana-Related and the Malama-Related Defendants challenge his reports and testimony as to damages on various grounds.

As alluded to above, Plaintiffs employ a dual expert arrangement with Duca and Bowen.  Duca is a bankruptcy attorney offered to testify as to damages, while Bowen is an accountant that compiled the financial data underlying Duca's proposed theory of damages.  Although the Court ultimately GRANTS Defendants' motions as to Duca on the matter of damages, to help clarify its ruling, the Court first addresses a few of the arguments it finds unpersuasive.

1.   Qualifications

The Ohana-Related Defendants argue that Duca lacks the necessary knowledge, skill, experience, training, or education under FRE 702 to testify on damages.  They point out that Duca is not an accountant; has never testified as an expert on damages, accounting issues, or the issue of adequate capitalization of a business; only took a few college and law school accounting classes about fifty years ago; and does not have any relevant degrees, licenses, or certifications in accounting, damages, or the subject of capitalization of a business, and he has never published any articles on any of these subjects.  *See* ECF No. 61 at 8–10. The Malama-Related Defendants also challenge Duca's credentials or lack thereof. *See* ECF No. 66-1 at 10–11.

Plaintiffs respond that Duca has over fifty years of experience as a business and bankruptcy attorney and during that time reviewed financial statements and bankruptcy schedules and developed general familiarity with failed businesses. *See* ECF No. 88-4 at 12–13.  Plaintiffs also argue that bankruptcy attorneys prepare schedules that are then used to determine whether the company should proceed in business under a plan or be liquidated, which is similar to what Duca did for his damages analysis:  he purportedly analyzed the damage inflicted on Debtor by continuing to operate when it should have been liquidated.  *Id.* at 13.

14

The Court concludes that Duca's purported lack of qualifications and prior experience as an expert do not preclude him from testifying.  "Expert testimony is admitted liberally under the Federal Rules." *Hambrook v. Smith*, Civ. No. 14-00132 ACK-KJM, 2016 WL 4084110, at *6 (D. Haw. Aug. 1, 2016) (citing *Daubert*, 509 U.S. at 593–95).  FRE 702 "contemplates a broad conception of expert qualifications." *Thomas v. Newton Int'l Enters.*, 42 F.3d 1266, 1269 (9th Cir. 1994).  Duca's experience as a bankruptcy attorney gives him specialized knowledge that the average layperson lacks.  He is familiar with contemplating and planning for bankruptcy and guiding a company through the process.  From that experience he has seemingly developed theories as to how a company may suffer harm from waiting too long to declare bankruptcy.

2.    Helpfulness To Jury

Duca proposes four different measures of damages.  *See* ECF No. 78-5 at 8. Two of the measures rely on the decrease of Island Air's net worth from the time Defendants' duties allegedly obligated them to shut the company down to the time when they actually closed the airline.  *See* ECF No. 78-5 at 8.  It is the jury's province to decide the date on which Defendants should have shut down the company.  *See id.*; ECF No. 78-3 at 11.  The other two measures rely on the increase in Island Air's liabilities over that same period.  *See* ECF No. 78-5 at 8. For all four measures, Duca relied on the financial data Bowen compiled.  *See id.*

15

In other words, he did not calculate any of the metrics upon which he bases his opinion.  Instead, he used those metrics and examined the difference in the values between when the company shut down and when it should have shut down.  Simply put, he subtracted figures on a chart that Bowen created.  *See id*.

The Ohana-Related Defendants argue that Duca's testimony on the difference in values should not be admitted because it does not represent specialized knowledge that a jury would find helpful.  *See* ECF No. 61 at 11–12.  They contend that to the extent the jury would need someone to testify about the financial metrics chart, it should be Bowen (who created it) rather than Duca.  *Id.* at 12.

Plaintiffs respond that Duca's testimony is "critical" because "[h]e uses his specialized knowledge to help the jury understand what the measure of the damages should be for a distressed company that is wrongfully allowed to stay in business, *i.e.*, the drop in net worth or the increase in liabilities, and how to evaluate those damages."  *See* ECF No. 88-4 at 14.  On the one hand, Plaintiffs' contention could be describing an attorney's job during closing argument or the Court's role in giving jury instructions.  On the other hand, damages cases involve "a hypothetical world that never existed, one in which other things remained the same but the [alleged] breach had not occurred."  *Alaska Rent-A-Car*, 738 F.3d at 968.  Perhaps Duca, having worked in the bankruptcy law sphere for a half

century, is more qualified than an accountant to opine on a counterfactual world in which Defendants shut the Debtor down at an earlier date. And while Duca's proposed testimony strays close to the Court's role of saying what the law is, the Court finds that his testimony about the chart could be helpful to the jury. Although Duca cannot tell the jury what the proper measure of damages is as a matter a law, he could theoretically testify as to why the numbers on the chart are relevant to demonstrating the harm the Debtor allegedly suffered.

Nevertheless, as addressed below, the Court cannot find Duca to be a reliable witness on damages based on the current record.

### 3. Reliability Of Methodology

The Ohana-Related Defendants challenge Duca's testimony because Duca's proposed measures of damages — either a decrease in net value or increase in liabilities from the date Island Air should have shut down — are unavailable under Delaware law for breach of fiduciary duty claims, or because they are otherwise unreliable. *See* ECF No. 61 at 13–15. The Plaintiffs respond that their proposed measures of damages — which some courts have called "deepening insolvency" — are proper under Delaware law. *See* ECF No. 88-4 at 19. While the question of the proper scope and applicability of law is better suited to a motion for summary judgment, which Defendants never sought, the Court briefly addresses the issues here to help clarify its ruling on the instant motions and to shape the parties'

17

preparations for trial.  And although the Court need not decide the precise contours of Delaware law at this stage, an analysis of the general principles reveals a problem with Duca's proposed testimony:  he fails to explain why his methodology yields a reliable measure of harm that Island Air purportedly suffered.

The Court's role as a gatekeeper requires it to analyze whether Duca's proffered "testimony is the product of reliable principles and methods."  Fed. R. Evid. 702(c).  And Plaintiffs, as the proponents of Duca, bear the "burden of establishing that the pertinent admissibility requirements are met by a preponderance of the evidence."  Fed. R. Evid. 702 advisory committee's note to 2000 Amendments (citing *Bourjaily v. United States*, 483 U.S. 171 (1987)).  But, on the instant record, the Court cannot discern whether Duca's opinion is the product of reliable principles because he fails to articulate *why* his proposed measures of damages fairly assess the harm to *the Debtor* as opposed to its creditors.  As such, the motions are granted as to Duca's testimony regarding damages.

Turning first to the general state of Delaware law on the issue of deepening insolvency.  The Ohana-Related Defendants contend that Delaware "courts have repeatedly, and consistently, rejected using a decline in net worth or an increase in liabilities as an acceptable measure of damages for breach of fiduciary duty."  ECF No. 98 at 18–19 (citations omitted).  While certain courts have cast doubt on the

18

so-called "deepening insolvency" theory of damages, others have acknowledged the theory's viability.  As an initial matter, Delaware law does not include a separate cause of action for deepening insolvency.  *See Trenwick Am. Litig. Tr. v. Ernst & Young, L.L.P.*, 906 A.2d 168, 205 (Del. Ch. 2006), *aff'd sub nom.*, *Trenwick Am. Litig. Tr. v. Billett*, 931 A.2d 438 (table), No. 495, 2006, 2007 WL 2317768 (Del. Aug. 14, 2007).  Regardless, Plaintiffs are not asserting a deepening insolvency cause of action and the bankruptcy court already denied a motion to dismiss on that matter.  *See* ECF No. 78-8 at 8.

Instead, Plaintiffs are trying to utilize a form of deepening insolvency as a measure of damages.  Some courts and commentators have criticized the approach. *See Seitz v. Detweiler, Hershey & Assocs., P.C. (In re CitX Corp.)*, 448 F.3d 672, 677–78 (3d Cir. 2006) (applying Pennsylvania law); *In re Troll Commc'ns, LLC*, 385 B.R. 110, 122 (Bankr. D. Del. 2008) (citing *Trenwick*, 906 A.2d at 204–05); *Off. Comm. of Unsecured Creditors of Radnor Holdings Corp. v. Tennenbaum Cap. Partners, LLC (In re Radnor Holdings Corp.)*, 353 B.R. 820, 849 (Bankr. D. Del. 2006) (citing *In re CitX Corp.*, 448 F.3d at 677–78); *see also* Sabin Willett, *The Shallows of Deepening Insolvency*, 60 Bus. Law. 549, 575 (2005).  While others have allowed it in theory.  *See Miller v. McCown De Leeuw & Co. (In re The Brown Schools)*, 386 B.R. 37, 48 (Bankr. D. Del. 2008); *Alberts v. Tuft (In re Greater Se. Cmty. Hosp. Corp. I)*, 353 B.R. 324, 335–38 (Bankr. D.D.C. 2006).

19

Neither the Delaware Chancery nor Supreme Courts have definitively said that deepening insolvency as a measure of damages is forbidden as a matter of law in all circumstances.  In *Trenwick*, for example, the Court of Chancery — which the Delaware Supreme Court summarily affirmed — merely rejected a cause of action for deepening insolvency.  *See Trenwick*, 906 A.2d at 207.  It did not preclude deepening insolvency as a measure of damages for breaches of fiduciary duty.  *See id.*; *see also Shandler v. DLJ Merch. Banking, Inc.*, C.A. No. 4797-VCS, 2010 WL 2929654, at *13 (Del. Ch. July 26, 2010) (granting motion to dismiss fiduciary duty claim based on deepening insolvency because facts pled made no coherent sense).  In other words, the law is somewhat unsettled as to the viability of deepening insolvency as a measure of damages.  Thus, the Court assesses whether Duca's proposals could reliably capture the harm Defendants allegedly caused.

The Ohana-Related Defendants argue that an increase in liabilities is not a proper measure of damages for breaches of fiduciary duty because the harm for such claims is to the company and not to its creditors.  *See* ECF No. 61 at 13.  They also claim that Duca's proposed decrease in net worth is essentially the same measure as his increase in liabilities.  *See id.* at 19.  The Ohana-Related Defendants reach their conclusion that those measures of damages are improper in somewhat circuitous fashion.  First, they assert that breach of fiduciary claims entitle a plaintiff to recover for harm to the *corporation*.  *See id.* at 13.  In other words,

20

"[c]laims of this type are classically derivative, in the sense that they involve an injury to the corporation as an entity and any harm to the stockholders and creditors is purely derivative of the direct financial harm to the corporation itself." *Prod. Res. Grp., L.L.C. v. NCT Grp., Inc.* (*PRG*), 863 A.2d 772, 776 (Del. Ch. 2004).  Next, they state that because breach of fiduciary duty claims are derivative, a creditor who has been harmed may not assert them directly.  *See* ECF No. 61 at 13–14 (citing *PRG*, 863 A.2d at 776).  While the Ohana-Related Defendants are not wrong that creditors cannot directly assert breach of fiduciary duty claims, that is not what is happening here.  The *Trustee* brought the breach of fiduciary duty claims, not creditors.  *See generally* AP ECF No. 1.

During the hearing, the Ohana-Related Defendants' counsel raised another red herring — that the Trustee lacks standing to assert claims on behalf of creditors.  But that isn't happening here either.  The Trustee brought the claims on behalf of the Debtor.  The *PRG* case favorably cited a federal bankruptcy court case in which a bankruptcy judge explained the relationship between a trustee, the creditors, and breach of fiduciary duty claims:

> It is of course true a trustee in bankruptcy is unable to enforce a claim belonging to a creditor.  But the Trustee asserts a claim which belonged to [the company] Healthco, not its creditors.  The Trustee contends the defendants breached their fiduciary duties *owed to Healthco.*  Any Healthco claim is an interest in property which passed to the bankruptcy estate.  The Trustee can bring any suit Healthco could have brought, including suits against directors and controlling shareholders for breach of

21

> fiduciary duty. In complaining that directors authorized a transaction that unduly weakened Healthco, the Trustee is not asserting the claim of creditors. He alleges Healthco was the victim of poor management causing damage to the corporation which necessarily resulted in damage to its creditors by diminishing the value of its assets and increasing its liabilities.

*PRG*, 863 A.2d at 793 n.65 (quoting *Brandt v. Hicks, Muse & Co. (In re Healthco Int'l, Inc.)*, 208 B.R. 288, 300 (Bankr. D. Mass. 1997)) (internal quotation marks omitted). Similarly, the Trustee here asserts claims on behalf of the Debtor for harm that the company suffered.

Still, the Ohana-Related Defendants' main point — that any damages must measure harm to Island Air rather than harm to its creditors — is well taken. This becomes confusing as a practical matter, however, because once a firm is insolvent and eventually declares bankruptcy, what is the distinction between a company and its creditors? That any benefit from prevailing on the Trustee's claims may eventually redound to the benefit of the Debtor's creditors is unremarkable. This is so because once a firm becomes insolvent its creditors become residual claimants. *See Quadrant Structured Prods. Co. v. Vertin*, 115 A.3d 535, 547 n.13 (Del. Ch. 2015) (citing *PRG*, 863 A.2d at 791); *see also PRG*, 863 A.2d at 791 ("By definition, the fact of insolvency places the creditors in the shoes normally occupied by the shareholders — that of residual risk-bearers. Where the assets of the company are insufficient to pay its debts, and the remaining equity is underwater, whatever remains of the company's assets will be used to pay

22

creditors[.]").  The Court points this out not to suggest that the damages to the creditors and the corporation are the same in this case, but merely to highlight that the categories of harm are not so clear-cut.  To that end, the need for an expert to explain to a jury what harm Island Air suffered as distinct from any damage Island Air's creditors sustained seems crucial.  Conversely, an expert could theoretically explain why the harm to Island Air and its creditors is exactly the same in this situation.  But that potential difference or similarity is exactly what Duca and Plaintiffs have failed to explain or account for here.

Duca's proposed measures of damages based on the decline in net worth or the increase in liabilities seem to overlap with harm that creditors might claim.  In any event, he does not explain why his proposed measures capture the harm Defendants' alleged breaches caused to Island Air as an entity.  One of the cases Plaintiffs cited in support of the availability of deepening insolvency explains the problem.  In *In re Greater Southeast Community Hospital Corporation*, the court held under Delaware law that deepening insolvency was a theory of harm.  *See In re Greater Se. Cmty. Hosp. Corp. I*, 353 B.R. at 336–38.  But the court also noted:

> This is not to suggest that the damages sought by [the bankruptcy trustee] Alberts are an accurate gauge of the injuries suffered by the debtors due to their alleged deepening insolvency.  Alberts seeks to recover for "the increased amount of insolvency suffered by the debtors."  This calculation might have represented a fair valuation of the harm caused to the *creditors* of DCHC (assuming that the debt was never repaid), but Alberts has no standing to protect creditors' interests.

23

> Instead, he will need to prove that DCHC and its subsidiary corporations were actually harmed by the defendants' allegedly excessive borrowing habits, and then quantify that harm.  The damages arising from these injuries (if proven) may be larger or smaller than the amount of excess debt acquired by the debtors, but they will almost certainly not be the same.

*Id.* at 338 (brackets, footnotes, and citation omitted).

Duca's reports fail to address the issue sufficiently, which gives the Court pause as to the reliability of his methodology.  In his report, for example, Duca merely states that between Island Air's decrease in net worth and its increase in liabilities, he considers decrease in net worth "to be best reflective of the damages sustained by [Island Air]."  ECF No. 61-2 at 11.  But why?  The report fails to explain.  In fact, the report seems to assume that the harm to Island Air's creditors is equivalent to the harm to the company.  Duca states:

> [D]amages should be measured from the time when a reasonable and objective person controlling the Company, whose motivation was solely to promote the best interests of the Company, would have determined that shutting down was necessary to minimize further losses and *to avoid incurring obligations to creditors that the Company had no ability to pay.*

*Id.* at 2–3 (emphasis added).  Similarly, in his rebuttal report, Duca noted that "[b]y the time bankruptcy commenced . . . the assets of the Company . . . were insufficient to pay more than a small fraction of its debts.  The losses are undoubtedly *relevant to the creditors who are owed the many millions of dollars of debt that [Island Air] ran up*."  *See* ECF No. 61-3 at 10 (emphasis added).

24

Duca apparently either made no attempt to parse out the harm that Island Air suffered because of Defendants' alleged breaches, or neglected to explain how he distinguished such damages or why doing so was unnecessary.  Instead, as far as the Court can tell, he just compared two figures on a balance sheet before and after a supposed breach.  As one court noted, in denying a motion to dismiss that targeted a deepening insolvency theory of harm, "[a] theory of harm (or a damage model) is different from a measure of damages."  *Redmond v. Kutak Rock, LLP (In re Brooke Corp.)*, 467 B.R. 492, 511 (Bankr. D. Kan. 2012).  The court continued that "[t]he well-reasoned cases allowing the damage model do not define the damages in terms of a comparison of balance sheets before and after the alleged wrongful act.  They require proof of specific itemized damages, such as increased liabilities and lost profits, proximately caused by a breach of a legally recognized duty."  *Id.* (footnote omitted).  So, while *In re Brooke* acknowledges the possibility of using increased liabilities as a factor in a damages calculation, it also emphasizes the shortcoming of the Duca report in that Duca seemingly just compared the balance sheet figures before and after without tying any specific harm to any specific action or stakeholder.

Duca's lack of an explanation of his methodology renders the Court's gatekeeping role difficult because the Court's task is to is focus on Duca's methodology rather than his conclusions, *i.e.*, his basis for saying that his measure

25

captures Island Air's damages. *See Grodzitsky*, 957 F.3d at 984–85 (citation omitted). In other words, the Court cannot assess the reliability of Duca's methodology because it is not sure what his methodology is. Most glaringly, the Court cannot tell whether Duca even considered a possible distinction between harm to the creditors and harm to the Debtor, let alone that he applied a reasonable methodology to quantify such damages. In short, Plaintiffs provide no basis to support whether Duca's approach is reliable and the Court thus GRANTS Defendants' motions as to Duca testifying as to damages.

By doing so, the Court is not necessarily rejecting a form of deepening insolvency as a potential measure of damages or necessarily precluding Plaintiffs from arguing the point at trial. Rather, the Court is precluding the testimony of the offered expert as an imprimatur as to the proper measure of damages where the expert failed to explain *why* his damages measure was proper. And while the decrease in net value or increase in liabilities may very well be proper measures of damages to the Debtor, Plaintiffs have not met their burden of demonstrating that their expert has a reliable method for calculating those damages at this stage. Further, whether Plaintiffs can still move to admit Duca or another expert to testify as to the measure of damages could be the subject of other motions but is not presently before the Court. Similarly, whether and to what extent counsel could argue that deepening insolvency is a measure of damages can be determined closer

to or during the trial via motions in limine or discussions regarding jury instructions.

## C.    Bowen

### 1.    Schedule 9

The Ohana-Related Defendants move for an order excluding Schedule 9 of Bowen's report.  *See* ECF No. 59 at 8–12.  There being no objection, *see* ECF No. 65 at 3–4, the Court GRANTS the motion as to Schedule 9.

### 2.    Supplemental/Rebuttal Report

The Ohana-Related Defendants' challenge to what they dub as the "Second Bowen Report" is really a discovery motion rather than a *Daubert* inquiry.  They argue that the Second Bowen Report was filed on the Court's deadline for rebuttal expert reports, but that the report does not contradict or rebut anything and therefore represents a late supplemental report.  *See* ECF No. 59 at 12–17.  Their primary evidence that the Second Bowen Report is not a proper rebuttal comes from Bowen's deposition when the accountant stated that his report was a supplement and "not a rebuttal with anyone."  *See* ECF No. 75-45 at 8.  Bowen later clarified that he did not know whether his report was intended "to rebut any opinion or evidence offered by an opposing expert."  *Id.* at 9.  Regardless, the Ohana-Related Defendants' reliance on the purported concession of Bowen fails to take into account the Plaintiffs' arrangement of Duca and Bowen as purported dual

27

experts.  Even though the Court strikes Duca's testimony as to damages, the numbers he asked for from Bowen are still proper rebuttal to Defendants' experts.

As Bowen noted in his deposition, he was a technical expert providing information requested by the attorneys.  *Id.*  Plaintiffs explain that Bowen's role was to generate accounting schedules to be used by attorneys in argument or by Duca in his damages analysis.  *See* ECF No. 75 at 24.  They contend that for the Second Bowen Report, "everything [Bowen] did was in response to a request, and every request was based on rebutting something from the defense experts."  *Id.* at 25.  Specifically, Plaintiffs assert that Defendants' experts had criticized Duca's use of book value from Bowen's accounting data, rather than fair market value.  *Id.* at 26.  So, in response to that criticism, Duca asked Bowen to provide him with information to attempt the calculations based on fair market value.  *Id.*  Plaintiffs then proceed to explain how Duca used each schedule in the Second Bowen Report.  *Id.* at 27–29.

The Ohana-Related Defendants respond that Duca's switch to a damages calculation using fair market value rather than book value is itself not a proper rebuttal and that therefore Bowen's data in support of that change is likewise not a rebuttal.  *See* ECF No. 97 at 11, 13.  The Court is unpersuaded.  To penalize Plaintiffs for their expert's response to criticism seems unreasonable and would create disincentives to adopting valid suggestions proposed by the other side's

28

experts.  Here, the evidence demonstrates that Duca refined his opinions to rebut

Defendants' criticisms.  In doing so, Duca asked Bowen for data.  The Court

concludes that such data represents a proper rebuttal report.[2]

### 3. Reliability Of Net Worth, Liabilities, And Fair Market Value Figures

The Ohana-Related Defendants challenge Bowen's reports to the extent they

include net worth, liabilities, and fair market value of assets figures.  *See id.* at 13–

18.  They argue that those figures do not reliably reflect an appropriate measure of

damages.  But the Ohana-Related Defendants conflate two issues:  the reliability of

Bowen's figures and the appropriateness of using those figures as a measure of

damages.  Bowen explained in his expert report that he simply compiled the

figures from the Debtor's accounting software.  *See* ECF No. 59-2 at 4.  He did

"nothing to change or alter the data in the accounting system."  *Id.*  Thus, the Court

DENIES the Ohana-Related Defendants' challenge to the figures themselves.  As

to the appropriateness of the figures as a measure of damages, Bowen was not

offered to testify to that matter — Duca was, and the Court addressed his testimony

above.

---

[2]  Alternatively, even if Bowen's Second Report was a supplement instead of a
rebuttal, the Court would conclude that its late submission was harmless.  The data
in the report is derived from Island Air's accounting software such that it would
have been available to Defendants as well as Plaintiffs.  Further, the switch from
book to fair value decreased Defendants' potential damages.

29

**D.    Newlon**

Plaintiffs retained Newlon as their damages expert on the DWA and WARN Act claims.  *See* ECF No. 62-2 at 3.  Both sets of Defendants seek her exclusion. *See* ECF No. 62; ECF No. 66-1 at 29–32.

1.    Qualifications

The Malama-Related Defendants contend that Newlon lacks sufficient airline experience and knowledge to testify as an expert on the potential damages from the WARN Act and DWA claims.  *See* ECF No. 66-1 at 29.  Specifically, they highlight that she has never served as an expert in a WARN Act or DWA case and has no previous commercial airline experience.  *See id.*  They also argue that her unfamiliarity with certain airline terms — which they characterize as "basic" — renders her incompetent to testify as an expert.  *Id.* at 30–32.  But the Malama-Related Defendants' view of her qualifications is too narrow.

Newlon has a Ph.D in economics, has been a Director at NERA Economic Consulting since 2018, and has served as a damages expert in dozens of cases (including wage and hour cases).  *See* ECF No. 66-11 at 18–26.  As previously stated, FRE 702 "contemplates a broad conception of expert qualifications." *Thomas*, 42 F.3d at 1269.  That Newlon has not testified as an expert in a case with the exact same claims and issues certainly does not disqualify her.  *See, e.g.*, *United States v. Smith*, 520 F.3d 1097, 1105 (9th Cir. 2008) (concluding district

court did not abuse discretion in certifying medical expert at trial who had not previously testified as a forensic expert), *aff'd in part on reh'g*, 561 F.3d 934, 937 n.1 (9th Cir. 2009) (en banc) (noting that the defendant did not raise the issue of expert's certification on petition for rehearing). The Court is satisfied that Newlon possesses the requisite knowledge, skill, experience, training, or education to testify as an expert on damages.

    2.   <u>Methodology</u>

        a.   <u>Compliance With WARN Act Language</u>

The Ohana-Related Defendants first challenge Newlon's methodologies and resulting opinions as inconsistent with the statutory language of the WARN Act. *See* ECF No. 62 at 7–12.

Under the WARN Act, "[a]n employer shall not order a plant closing . . . until the end of a 60-day period after the employer serves written notice of such an order" to the affected employees or their representatives. *See* 29 U.S.C. § 2102(a)(1). An employer that violates the notice requirement

> shall be liable to each aggrieved employee who suffers an employment loss as a result of such closing or layoff for —
>
> (A) *back pay* for each day of violation at a rate of compensation not less than the higher of —
>
> (i) the *average regular rate* received by such employee during the last 3 years of the employee's employment; or
>
> (ii) the *final regular rate* received by such employee[.]

*Id.* § 2104(a)(1) (emphases added).

31

The Ohana-Related Defendants argue that because Newlon did not use the average regular rate or final regular rate to calculate back pay, her methodology runs afoul of the statute. *See* ECF No. 62 at 7–9. Instead of using one of those two rates to determine back pay, Newlon developed a different methodology for calculating back pay. Newlon calculated a "weighted average share" of total or compensable hours, *see* ECF No. 62-2 at 8; ECF No. 62-3 at 3, she then "multiplied each employee's estimated monthly compensable hours by their hourly wage rate, as dictated by their CBA." ECF No. 62-3 at 3. She generated the weighted average share figure to estimate hours because if she simply used the employees' October 2017 hours (the month before the shutdown) it would not account for the wide variance in hours worked per month. *See* ECF No. 62-2 at 8. Thus, she developed the weighted average share of hours figure for the affected employees. *See* ECF No. 62-3 at 2–3.

To arrive at the weighted average share, Newlon estimated how much each employee worked on average relative to their colleagues by calculating the employee's proportion of the total hours worked across multiple months. *See id.* Newlon calculated each employee's proportion of the total number of hours by adding up the hours each employee worked for the months of August, September, and October, and then dividing by the total hours worked by all employees in the same months. *See id.* She then used the October 2017 hours as a benchmark for

the total number of available hours going forward because the October hours

accounted for the decrease in hours available after the reduction of planes in use.

*See id.* at 3; *see also* ECF No. 62-2 at 6 (describing the reduction of planes from

five to three in mid-September 2017).  Using the October 2017 hours as a

benchmark, she multiplied that figure with the proportion of hours that each

employee had worked in August, September, and October to estimate each

individual employee's share of hours over the 60-day period of violation.  Newlon,

thankfully, provided charts to demonstrate her approach.  *See* ECF No. 62-3 at 18–

19.

**Calculation of Estimated Monthly Hours**
**Three Hypothetical Employees**

| Hypothetical Employee | Monthly Compensable Hours | | | | Average Proportion of Total Hours | Estimated Monthly Hours |
|---|---|---|---|---|---|---|
| | August | September | October | Total | | |
| (1) | (2) | (3) | (4) | (5) Σ (2) : (4) | (6) (5) / 710 | (7) (6) * 235 |
| 1 | 80 | 90 | 80 | 250 | 0.35 | 82.7 |
| 2 | 70 | 85 | 75 | 230 | 0.32 | 76.1 |
| 3 | 75 | 75 | 80 | 230 | 0.32 | 76.1 |
| *Total* | 225 | 250 | 235 | 710 | 1 | 235 |

The chart above depicts how Newlon calculated three hypothetical employees'

estimated monthly hours based on their average proportion of total hours from the

previous three months and multiplied by the total amount of hours in October.

Newlon then multiplied the hypothetical employee's estimated monthly hours by

that employee's wage rate, as shown in the chart below.  *See id.* at 3–4.

33

**Calculation of Estimated Monthly Damages**
**Three Hypothetical Employees**

| Hypothetical Employee | Estimated Monthly Hours | Hourly Pay Rate | Estimated Monthly Damages |
|---|---|---|---|
| (1) | (2) | (3) | (4) (2)*(3) |
| 1 | 82.7 | $  109.21 | $  9,037 |
| 2 | 76.1 | 69.54 | 5,294 |
| 3 | 76.1 | 44.09 | 3,356 |

*Id.* at 19.

The question for the Court, therefore, is whether Newlon's methodology to estimate back pay is permitted under the WARN Act.  First, contrary to the Ohana-Related Defendants' suggestion, the WARN Act does not require that an employer pay *either* the average regular rate received by an employee over the previous three years *or* the final regular rate received by an employee before the employer's violation.  Instead, the plain language of the statute sets the higher of those two figures as the floor for the calculation of back pay.  *See* 29 U.S.C. § 2104(a)(1)(A) (employer liable for "back pay for each day of violation at a rate of compensation *not less than the higher* of" average regular rate or final regular rate (emphasis added)).  The Ninth Circuit has said as much:

> The Act states that an employer is liable for back pay at a rate *not less than* the higher of the calculations specified in subsections (A)(i) and (A)(ii).  These subsections do not define "back pay"; rather, they establish a floor for WARN Act damages, thereby preventing employers from lowering wages shortly before closure in order to diminish their WARN Act liability.

34

*Local Joint Exec. Bd. of Culinary/Bartender Tr. Fund v. Las Vegas Sands, Inc.*, 244 F.3d 1152, 1158 (9th Cir. 2001).  Thus, Newlon's decision not to use one of the two statutory floors to estimate damages is not contrary to law.

Next, the Ohana-Related Defendants contend that Newlon did not attempt to determine the number of hours that the employees would have worked during the 60 days after the shutdown.  *See* ECF No. 62 at 10–12.  They argue that Newlon's estimates ignore that the work available for the 60 days after the alleged violation would have declined further because the remaining planes went out of service in mid-November.  *See id.* at 10.  But the Ohana-Related Defendants distort Newlon's so-called acknowledgment that additional planes went out of service in mid-November.  Newlon was clearly discussing the reduction of planes from five to three in mid-September.  *See* ECF No. 62-2 at 6.  In fact, Newlon was actually commenting that if those planes went out of service in relation to the shutdown, the employees could argue that their estimates "should be based on higher average work hours from months that were unaffected by the shutdown."  *Id.*  In reply, the Ohana-Defendants do not give up the point.  They press ahead that at some unspecified date in mid-November, the remaining planes were grounded.  *See* ECF No. 95 at 9.  But they do not provide evidence about the grounding of the planes in mid-November, let alone whether it was planned and unrelated to the closure of the airline.  Of course, the Court cannot help but wonder whether the Ohana-Related

Defendants are being intentionally vague about the date because those planes were grounded as part of the allegedly unannounced shutdown.  The Ohana-Related Defendants' attacks do not convince the Court that Newlon's process by which she arrived at the estimates was somehow contrary to the WARN Act or otherwise unreliable.  Regardless, the Ohana-Related Defendants can challenge Newlon's calculations on cross-examination.

The Ohana-Related Defendants' reliance on *United Mine Workers Int'l Union v. Martinka Coal Co.*, 45 F. Supp. 2d 521, 527 (N.D.W. Va. 1999), *aff'd*, 202 F.3d 717 (4th Cir. 2000), is unpersuasive.  In that case the coal mine continued employing 211 people after 82 were laid off in October 1995 in violation of the WARN Act.  *See id.*  The district court — in ruling on damages after a bench trial — factored a mining roof collapse into its decision to reduce the amount of Saturday and Sunday overtime pay that the aggrieved employees could receive. *See id.*  The roof collapse occurred in August 1995 and the mine closure was announced in October 1995.  *See id.*  During the 60 days after the announced closure, Saturday and Sunday work was still available but "it was at a much diminished rate as a consequence of the roof fall and planned mine closing."  *Id.* The aggrieved employees argued that they should receive damages for their regularly scheduled overtime from prior to the roof collapse and planned closing. *See id.*  The court concluded that the aggrieved employees were entitled to

damages for the overtime pay, but at a lower rate than what they had argued because there was less Saturday and Sunday work available in the sixty days after the closing.  *See id.* at 527–28.

The Court finds *Martinka Coal* distinguishable on both its facts and procedural posture.  On its facts, *Martinka Coal* is inapposite to the situation here because the mine kept employing certain workers in the sixty days after the WARN Act violation.  There was thus direct evidence regarding how much overtime would have been available had they not been laid off.  Here, the airline ceased all operations basically simultaneous with the alleged WARN Act violation. Similarly, the district court in *Martinka Coal* was ruling on damages after a bench trial based on evidence; not determining whether an expert could propose a different estimate of damages.  In essence, all the district court did was conclude that the aggrieved employees had not proven that they were entitled to the damages figure they sought for overtime pay.  *Martinka Coal*, thus, does not stand for the principle that Newlon's methodology for estimating the hours the employees would have worked renders her opinions excludable.

b.    Challenges To Specific Categories Of Employees

The Ohana-Related Defendants further attack Newlon's estimates for including certain categories of employees that they claim are excluded from the purview of the WARN Act.  *See* ECF No. 62 at 12–16.  The Court concludes that

such challenges are more appropriate topics for motions in limine, or during trial. Ultimately, Plaintiffs will have to prove damages. If certain employees are not entitled to collect damages, that should be dealt with outside the context of a *Daubert* motion. Similarly, if Newlon included in her estimates some employees who are eventually found to be ineligible to recover, that can be addressed at trial and does not render her overall methodology unreliable. These types of arguments "go to the weight of the testimony and its credibility, not its admissibility." *See Alaska Rent-A-Car*, 738 F.3d at 970. As such, they may "be attacked by cross examination, contrary evidence, and attention to the burden of proof, not exclusion." *See id.* at 969 (quoting *Primiano*, 598 F.3d at 564). The Court will nevertheless briefly address each of Defendants' arguments.

First, the Ohana-Related Defendants point out that Newlon's estimates included employees who worked off-island at locations other than Island Air's Honolulu headquarters. *See* ECF No. 62 at 12–13. In effect, they are arguing that those employees in Kona, Lihue, or Kahului did not suffer a plant closing because they worked at "separate sites of employment." *See id.* at 12. However, there has been no determination whether those off-island employees work at a separate or a single site of employment, and there may be factual disputes which preclude ruling on the matter now. Defendants could have, but did not, seek summary judgment

38

on the issue.  The Court will not accept a backdoor motion for summary judgment ruling on the matter now.

Second, the Ohana-Related Defendants challenge Newlon's inclusion in her estimates of employees on leaves of absence.  *See id.* at 13–14.  Under the WARN Act, "[w]orkers on temporary layoff or on leave who have a reasonable expectation of recall are counted as employees."  *See* 20 C.F.R. § 639.3(a)(1)).  At this point, there appears to be a factual dispute as to whether any employees on leave would have a reasonable expectation of recall.  Including such employees in her damages calculation does not render Newlon's estimates unreliable.  The Ohana-Related Defendants may cross-examine her on such issues.

Third, the Ohana-Related Defendants assert that Newlon incorrectly included vacation pay for employees who were not eligible for it.  *See* ECF No. 62 at 14–15.  Again, this is an issue that requires the weighing of evidence and is better suited to determination outside of the *Daubert* context.

Fourth, the Ohana-Related Defendants claim that many of the employees included in the damages estimate are no longer union members and that the Unions therefore cannot represent them.  *See id.* at 15–16.  The Court will not rule as a matter of law in the forum of a *Daubert* motion, and Newlon's potential inclusion of such employees does not render her unsuitable to testify as to damages.

39

Thus, the Court DENIES the Ohana-Related Defendants' motion as to Newlon.

      c.      <u>Duplicative Recovery</u>

The Ohana-Related Defendants briefly argue that Newlon's calculations may allow for double recovery under the DWA and WARN Act Claims. *See id.* at 16–17. Whether such a recovery is permissible is a question of law that is ill-suited to the instant motion. The Court DENIES the Ohana-Related Defendants' motion insofar as they seek to exclude Newlon on this duplicative recovery basis, but the Court takes no position at the moment as to whether such damages would be available if Plaintiffs prevail on their WARN Act and DWA claims.

      d.      <u>The Malama-Related Defendants Reliability Challenges</u>

The Malama-Related Defendants argue that Newlon should be excluded because she did not consider the Unions' administrative expense claims. *See* ECF No. 66-1 at 22–26. They neither provide any support for why such a lack of consideration would render her opinions excludable under FRE 702 nor explain how her opinions or methodology are unreliable.

The Malama-Related Defendants also argue that Newlon should be excluded because she did not verify which employees had designated the Unions as their representatives. *See id.* at 27–28. Again, the Malama-Related Defendants provide no support for why Newlon's reliance on counsel's lists render her opinions

40

unreliable.  In fact, they do not even contest the accuracy of the lists that Newlon used.  *See generally id.*

In reply, the Malama-Related Defendants claim that Newlon ignored "essential" data by disregarding the Unions' administrative expense requests and by not verifying counsel's list of designated employees, but fail to explain why such data are essential or even relevant.  The Malama-Related Defendants' motion on these grounds is DENIED.

**E.   Gibson**

1.   <u>Relevance</u>

Plaintiffs offer Gibson as an airline industry expert.  *See* ECF No. 60-2. Neither group of Defendants challenge his qualifications or expertise as to the airline industry.  Instead, the Defendants contest the relevance of Gibson's opinions.  The Ohana-Related Defendants present a more substantial challenge to Gibson.  First, they argue that Gibson's testimony is irrelevant in that it relates to "duty of care" issues and not "duty of loyalty" or "duty of good faith" issues.  *See* ECF No. 60 at 8–14.  The Ohana-Related Defendants also argue that Gibson's opinions about topics outside of his expertise must be excluded.  *Id.* at 14. Specifically, they attack portions of Gibson's report that purportedly relate to Defendants' states of mind or motives, portions of his report where he "argue[s] from the evidence," and portions of his report where he allegedly provides legal

41

conclusions.  *See id.* at 14–19.  The Malama-Related Defendants argue that their

expert says that Gibson's report at times relies on hindsight and engages in

speculation.  *See* ECF No. 66-1 at 21–22.  They ask that those passages of the

Gibson report be excluded.  *Id.* at 22.

As an initial matter, the Court concludes that the instant set of motions is an

inappropriate time to conduct a line-by-line examination of Gibson's reports to

determine the admissibility of each individual statement.  Such objections may be

addressed ahead of trial in the form of a motion in limine, or during trial.  Thus, to

the extent the Defendants ask the Court to analyze each line of the reports, the

Court presently declines to do so and denies the requests.  The Court focuses on

the bigger picture relevance questions regarding Gibson's proposed testimony.

      a.      <u>"Duty Of Care" Testimony</u>

Under Delaware law, corporate directors have three fiduciary duties:  due

care, loyalty, and good faith.  *See Emerald Partners v. Berlin*, 787 A.2d 85, 91

(Del. 2001).  "A plaintiff cannot prove a breach of the duty of care without a

showing of gross negligence.  The exact behavior that will constitute gross

negligence varies based on the situation, but generally requires directors and

officers to fail to inform themselves fully and in a deliberate manner."  *Off. Comm.*

*of Unsecured Creditors of Fedders N. Am., Inc. v. Goldman Sachs Credit Partners*

*L.P. (In re Fedders North America, Inc.)*, 405 B.R. 527, 539 (Bankr. D. Del. 2009)

(citations omitted).  "By contrast, the duty of loyalty mandates that the best interest of the corporation and its shareholders takes precedence over any interest possessed by a director, officer or controlling shareholder and not shared by the stockholders generally."  *Id.* at 540 (internal quotation marks and citation omitted). To plead a breach of loyalty, "plaintiffs must allege facts showing that a self-interested transaction occurred, and that the transaction was unfair to the plaintiffs."  *Id.* (internal quotation marks and citation omitted).  A plaintiff can establish a breach of the duty of good faith in various ways, but three examples are when a director intentionally acts with a purpose other than advancing the best interests of the corporation, when a director intentionally violates a law, or when a director intentionally fails to act in the face of a known duty to act.  *See id.* (citing *Brehm v. Eisner (In re Walt Disney Co. Deriv. Litig.)*, 906 A.2d 27, 67 (Del. 2006)).

A corporation may include in its articles of incorporation a provision "to exculpate their directors from monetary damage liability for a breach of the duty of care."  *See In re Walt Disney Co. Deriv. Litig.*, 906 A.2d at 65 (citing Del. Code tit. 8, § 102(b)(7)).  A corporation may not, however, exculpate directors for breaches of the duties of loyalty or good faith.  *See* Del. Code tit. 8, § 102(b)(7).

The Ohana-Related Defendants argue that the Debtor's articles of incorporation exculpate Marinelli for monetary liability from any breach of the

43

duty of care. *See* ECF No. 60 at 8–9. Thus, they argue that any testimony from Gibson about duty of care issues is irrelevant. *See id.* at 9–10. To highlight where Gibson's report allegedly discusses duty of care issues as opposed to issues related to other duties, the Ohana-Related Defendants provide Appendix 1, which cites various excerpts of Gibson's report. *See id.* at 21–25. The Ohana-Related Defendants' arguments are unpersuasive for several reasons.

First, even if a *Daubert* motion as opposed to a motion for summary judgment is a proper vehicle to raise the exculpatory provision, the Ohana-Related Defendants ignore that there is a factual dispute about whether the exculpatory provision applies to Au. *See* ECF No. 80-6 at 6 (Bankruptcy Court's denial of Malama-Related Defendants' motion to dismiss on the exculpatory provision). Thus, duty of care questions may still be relevant in this case.

Further, opinions can be relevant to multiple issues. That Gibson's opinions may discuss duty of care issues does not preclude them from also being relevant to duty of loyalty or good faith questions. For example, opinions about whether the Debtor's actions were realistic or reasonable, *see e.g.*, ECF No. 60 at 21–22, certainly relate to whether the Defendants acted with gross negligence. But they can also be relevant to whether the Defendants' had ulterior motives that were either self-interested or contrary to the best interests of Island Air. The Court thus denies the Ohana-Related Defendants' challenge on this ground.

44

b.   Topics Allegedly Outside Gibson's Expertise

The Ohana-Related Defendants challenge Gibson's testimony that they

argue relates to the Defendants' motive or state of mind, "arguments from

evidence," and legal opinions.  *See id.* at 15–19.  In doing so, they provide a

sampling of allegedly improper statements.  *See id.* at 21–32.  Similarly, the

Malama-Related Defendants seek to exclude Gibson's statements where he

allegedly relies on hindsight and speculation.  *See* ECF No. 66-1 at 21–22.  As the

Court stated above, it will not conduct a line-by-line analysis of the reports at this

time.

Suffice it to say, an expert treads on treacherous ground when testifying as

to someone's motive or state of mind.  *See Siring v. Or. State Bd. of Higher Educ.*

*ex rel. E. Or. Univ.*, 927 F. Supp. 2d 1069, 1077 (D. Or. 2013) ("Courts routinely

exclude as impermissible expert testimony as to intent, motive, or state of mind."

(citations omitted)).  But an expert may testify whether a certain practice is

consistent with a particular state of mind.  *See In re Term Commodities Cotton*

*Futures Litig.*, No. 12-CV-5126 (ALC), 2020 WL 5849142, at *14 (S.D.N.Y. Sept.

30, 2020).  The Court will draw finer lines at a later date.

Similarly, the Court will address testimony that strays into argument,

speculation, or legal conclusions ahead of or at trial.  Thus, the Court DENIES

Defendants' motions on these grounds

45

c.   Testimony About Undercapitalization And Insolvency

The Ohana-Related Defendants argue that Gibson's opinions about undercapitalization and insolvency are only related to the equitable claims for the Court to decide and therefore should not be presented to the jury. *See* ECF No. 60 at 19; *see also* AP ECF No. 1 at 104–07 (Counts XII and XIII for "Equitable Subordination" and "Recharacterization from Debt to Equity"). Plaintiffs agreed to withdraw a portion of the Gibson report but assert that the Debtor's undercapitalization is a major aspect of their fiduciary duty claims. *See* ECF No. 88-9 at 30. The Court DENIES the motion for the reasons Plaintiffs provide. Their theory of the alleged breaches is that the fiduciaries kept Island Air going for improper reasons without providing sufficient capital, and they should be able to present expert testimony in that regard. *See, e.g.*, AP ECF No. 1 at 100–02 (Count IX for "Breach of Fiduciary Duties of Care and Loyalty and Piercing the Corporate Veil – Implementing Undercapitalized Business Plan").

**F.    Kahan**

By law, airlines that propose a substantial change in ownership must submit certain data to the United States Department of Transportation ("DOT") so that the agency may determine the fitness of the airline. *See* 14 C.F.R. § 204.5. As part of the Malama-Related Defendants' acquisition of a two-thirds stake in Island Air, the company submitted sworn financial projections to DOT. *See* ECF No. 66-1 at 16–

18;  ECF No. 66-7 at 21.  Apparently, DOT approved the change in ownership.
*See* ECF No. 66-8 at 10.

Plaintiffs offered Kahan as a rebuttal witness to Defendant's expert Edward
McDonough, who noted DOT's approval of Island Air's change of ownership as
evidence of the reasonableness of the financial projections that Island Air
submitted to DOT.  *See* ECF No. 66-8 at 2.  Kahan explained that his engagement
included "render[ing] an opinion concerning the usefulness in analyzing an
airline's financial projections of a positive determination of continuing fitness, in
the context of a change-of-control application, by the United States Department of
Transportation."  *Id.*  His report was "intended to help the court evaluate, in
particular, the weight to be given statements by witness Edward M. McDonough
that cite such a fitness determination as implicit evidence of the reasonableness of
an airline's financial projections."  *Id.*  Kahan opined that DOT approval "is not at
all useful in analyzing whether the company's financial projections were
commercially realistic."  *Id.* at 3.

The Malama-Related Defendants seek to exclude Kahan's report and
testimony because his experience is outdated and because he has no personal
knowledge about how DOT exercised its discretion in approving Island Air's
change of ownership.  *See* ECF No. 66-1 at 19–21.  Specifically, they argue that
Kahan's experience with DOT's predecessor agency (the CAB) ended more than

47

33 years before the DOT's approval of Island Air's change in ownership and that Kahan's participation in Spirit Airlines' change of control fitness determination occurred two and a half decades ago, in 1996. *See id.* at 19–20.  Plaintiffs respond with an additional declaration from Kahan, which details his experience.  *See* ECF No. 79-1.

Lack of personal knowledge as to the DOT's determination of fitness in this case is not grounds for excluding Kahan.  In fact, if he had such knowledge, he could potentially testify as a percipient witness rather than an expert.  The Court DENIES the Malama-Related Defendants' motion on this ground.

As to Kahan's qualifications, the Court DENIES the Malama-Related Defendants' motion.  Kahan has decades of airline industry experience and knowledge of the history of the fitness determination process and regulations.  *See* ECF No. 66-8 at 2–6.  He was involved in the formation of the fitness and certification standards in the 1980s, and guided Spirit airlines through continuing fitness proceedings as lead regulatory counsel in 1992, 2004, and 2006.  *See* ECF No. 79-1 at 2–3.  The Court finds Kahan qualified.

## IV.    CONCLUSION

For the foregoing reasons, the Court grants Defendants' motions to exclude Duca regarding his damages testimony and reports.  The Court denies the

remainder of the motions to exclude Plaintiffs' proffered witnesses. The Court

grants in part and denies in part Plaintiffs' motion to strike.

IT IS SO ORDERED.

DATED: Honolulu, Hawai'i, August 17, 2022.

Jill A. Otake
United States District Judge

CIV. NO. 19-00574 JAO-RT, CIV. NO. 20-00246 JAO-RT, *Kane, et al. v. PaCap Aviation Finance, LLC, et al.*; ORDER GRANTING IN PART AND DENYING IN PART DEFENDANTS' MOTIONS TO EXCLUDE VARIOUS EXPERT TESTIMONY (ECF NOS. 59–62, 66), AND GRANTING IN PART AND DENYING IN PART PLAINTIFFS' MOTION TO STRIKE (ECF NO. 102)

49