IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF HAWAII

| | |
|---|---|
| ELIZABETH A. KANE, BANKRUPTCY TRUSTEE; AIR LINE PILOTS ASSOCIATION, INTERNATIONAL; HAWAII TEAMSTERS AND ALLIED WORKERS, LOCAL 996, <br><br> Plaintiffs, <br><br> vs. <br><br> PACAP AVIATION FINANCE, LLC; PACIFICCAP INVESTMENT MANAGEMENT, LLC; MALAMA INVESTMENTS, LLC; SNOWBIZ VENTURES, LLC; PACAP MANAGEMENT SOLUTIONS, LLC; PACAP ADVISORS, LLC; JEFFREY AU; JACK TSUI; JACK CHUCK SHE TSUI TRUST; LAWRENCE INVESTMENTS, LLC; LAWRENCE J. ELLISON REVOCABLE TRUST; OHANA AIRLINE HOLDINGS, LLC; CARBONVIEW LIMITED, LLC; PAUL MARINELLI; LAWRENCE J. ELLISON; CATHERINE YANNONE; CHRISTOPHER GOSSERT, <br><br> Defendants. | CIV. NO. 19-00574 JAO-RT <br> CIV. NO. 20-00246 JAO-RT[1] <br><br> ORDER GRANTING IN PART AND DENYING IN PART DEFENDANTS' MOTIONS TO EXCLUDE THE EXPERT TESTIMONY OF JAMES DUCA, ECF NOS. 133 AND 136 |

---

[1] Case No. 20-00246 JAO-RT was consolidated with Case No. 19-00574 JAO-RT on April 7, 2021. The latter case is the lead case, and the Court cites only to the docket items from that case, in this Order. *See* ECF Nos. 16 & 17. The former case involves mostly the same parties but has a different procedural posture, having been brought as a bankruptcy adversary proceeding in the matter of Debtor Hawaii Island Air, Inc., the corporate entity at the center of both cases.

**ORDER GRANTING IN PART AND DENYING IN PART DEFENDANTS'
MOTIONS TO EXCLUDE THE EXPERT TESTIMONY OF JAMES DUCA,
ECF NOS. 133 AND 136**

Before the Court are two motions to exclude expert testimony in this

bankruptcy adversary proceeding, which was initiated in the United States

Bankruptcy Court for the District of Hawaii[2] on August 12, 2019 by Plaintiff

Elizabeth A. Kane—the Chapter 7 Trustee ("Trustee") for Debtor Hawaii Island

Air, Inc. ("Island Air" or the "Debtor")—as well as by Plaintiffs Air Line Pilots

Association, International, and Hawaii Teamsters and Allied Workers, Local 996

(collectively, "Plaintiffs").  Following withdrawal of the reference to the

Bankruptcy Court on November 20, 2019, ECF No. 6, the parties conducted expert

discovery, during which two groups of Defendants moved to exclude expert

testimony under *Daubert v. Merrell Dow Pharmaceuticals, Inc.*, 509 U.S. 579

(1993).  The first group, the "Malama Defendants," comprised:

> Jeffrey Au ("Au");
> Malama Investments, LLC;
> PaCap Advisors, LLC;
> PaCap Aviation Finance, LLC;
> PaCap Management Holdings, LLC;
> PaCap Management Solutions, LLC;
> PacifiCap Investment Management, LLC;
> PacifiCap Management, Inc.;
> SnowBiz Ventures, LLC;

---

[2] *Kane v. PaCap Aviation Fin., LLC*, AP No. 19-90027 (Bankr. D. Haw.) ("AP"),
ECF No. 1.  In this Order, the Court cites to filings in the adversary proceeding as
"AP ECF No. ##."

Jack Tsui; and
The Jack Cheuk She Tsui Revocable Living Trust.

*See* ECF No. 66.  The second group, the "Ohana Defendants," comprised:

Paul Marinelli ("Marinelli");
Ohana Airline Holdings, LLC;
Carbonview Limited, LLC;
Lawrence Investments LLC;
Lawrence J. Ellison; and
Paul Marinelli and Lawrence J. Ellison, as co-trustees of the
Lawrence J. Ellison Revocable Trust.[3]

*See* ECF Nos. 59–62.  Both groups of Defendants (collectively, "Defendants")

moved to exclude the testimony of Plaintiffs' damages expert James Duca, among

others.  *See* ECF Nos. 61, 66.

On August 17, 2022, the Court granted in part and denied in part

Defendants' first set of motions to exclude.  ECF No. 112.  As to Duca's

testimony, the Court granted those motions because the Court could not discern

whether Duca's opinions were the product of reliable methodologies.  *Id.* at 17–27.

After the Court's order, Duca supplemented his expert report to further explain his

damages theories, *see* ECF No. 133-3, and Defendants renewed their challenges to

Duca's testimony by filing new Motions to Exclude, ECF Nos. 133 and 136

---

[3]  The Bankruptcy Court previously dismissed the Lawrence J. Ellison Revocable
Trust as a party because "it is not an entity with capacity to sue or be sued."  AP
ECF No. 60 at 8.  The court specified, however, that the dismissal would "have no
practical effect because the claims against Mr. Marinelli and Mr. Ellison as trustees
of the Ellison Trust [would] remain."  *Id.*

("Defendants' Motions").  Defendants filed identical motions in the related case, Case No. 20-00246 JAO-RT, ECF Nos. 134 and 137.

For the following reasons, the Court finds Duca's methodology for his damages theory of declining net worth to be reliable, but the Court finds otherwise regarding Duca's testimony on his damages theory of increasing liabilities.  The Court thus GRANTS IN PART and DENIES IN PART Defendants' Motions.

## I.    BACKGROUND

**A.    Factual Contentions in the Complaint**

This is a complex case involving multiple parties and claims.  The Complaint is over 100 pages and covers many issues not pertinent to this Order.  *See* ECF No. 1-2.  Because the parties are familiar with the underlying facts, the Court provides only a brief and simplified overview of the relevant allegations.

This case stems from the shutdown and bankruptcy of the now-defunct Island Air, a Delaware corporation.  *See id.*  The Ohana Defendants were the sole owners of Island Air from 2013 to February 2016, when they sold a controlling two-thirds interest to the Malama Defendants.  *Id.* at 9.  Defendant Paul Marinelli was on Island Air's board of directors from the date of the Ohana Defendants' purchase until July 2017, effectively representing the interests of the Ohana Defendants.  *See id.* at 10, 12.  Although Defendant Jeffrey Au was never formally a board member, he effectively represented the interests of the Malama Defendants

4

by selecting board members who would not challenge his apparent authority and by directing day-to-day operations through that apparent authority. *See id.* at 19–21, 33. Au, in fact, made attempts to insulate himself from fiduciary duties by intentionally choosing not to be a director or officer but instead designating himself the "Managing Director, Chairman and a member of the Executive Committee." *Id.* at 20.

Island Air's downward spiral began around the time at which the Malama Defendants purchased their two-thirds controlling interest in it during the first quarter of 2016 (the "2016 transaction"). *See id.* at 17. The 2016 transaction purposefully left Island Air undercapitalized, as Au and Marinelli knew that the money invested was insufficient capital for Island Air to survive. *Id.* There was no scenario where the money invested would have been sufficient to sustain operations, as shown by reasonable projections of revenue indicating that Island Air had been unprofitable and had burned through large amounts of cash from 2013 to 2016. Additionally, the Ohana Defendants kept Island Air afloat during that time by contributing somewhere between $50 to $75 million. *See id.* That grim outlook was of little concern to Au and Marinelli, however, because they structured the 2016 transaction primarily with senior secured loans, instead of equity investments, in an attempt to guarantee recovery of their respective interest groups' investments in the event of Island Air's bankruptcy. *See id.* at 13, 16.

By May 2017, Island Air had run into a financial crisis.  *Id.* at 22.  That crisis continued into October 2017, when Island Air filed for Chapter 11 bankruptcy.  *Id.* at 22–27.  Island Air was kept on life support during that May to October timeframe by a series of cash infusions primarily controlled by Marinelli, acting on behalf of the Ohana Defendants.  *See id.*  The purpose of the infusions was to keep Island Air alive long enough so that Marinelli could direct the sale of spare airplane parts on which his investor group held collateral, triggering sizeable payments to that investor group.  *Id.* at 12–13, 50–51, 77–78.  The sale was completed on September 15, 2017, but Marinelli had resigned from the board months before to avoid fiduciary liabilities associated with the sale.  *See id.* at 66–67, 77.

During the same time period that Island Air was on life support—May through October 2017—Au stonewalled any realistic outside investments that would have required him to convert his investor group's debt into equity.  *Id.* at 26–27.  He believed such investments would cause his investor group to lose priority in the event of Island Air's bankruptcy.  *Id.*  He also believed such investments would dilute his investor group's equity, causing him to lose control over the airline.  *Id.*  As a result, "he proposed only the most unrealistic investments that he knew would be unlikely to succeed," hoping for a homerun deal with an outside investor that would result in a significant return on the

6

purported debt investment. *Id.* at 27. He figured that this approach had little downside: either his investment group would hit it big or would get its investment back quickly in the event of a bankruptcy. *Id.* at 14, 26–27.

So while Marinelli was interested in keeping Island Air alive only long enough to sell the spare airplane parts, Au was searching for an improbable offer from an outside investor and was juicing up Island Air's financial projections to lure one in. *Id.* at 14. All the while, Island Air was in a death spiral, losing money for its creditors and racking up more debt. *Id.* at 74. Au's hopes deflated on October 16 with the Chapter 11 bankruptcy filing, *see id.*, further deflated on November 8 with the conversion to Chapter 7 bankruptcy, *see id.* at 27, and completely collapsed on November 10 when Island Air permanently shut down its operations, *see id.*

Some portions of the Complaint allege that the ultimate outcome of Au's and Marinelli's misconduct—Chapter 7 liquidation and termination—was not surprising given Island Air's unmet need for cash and inability to secure outside investments. *See, e.g.*, *id.* at 81 ("Island Air's closure was inevitable."); *id.* at 104 ("Island Air was undercapitalized from the beginning[.]"). But elsewhere, the Complaint seems to suggest that if Au and Marinelli had acted in the interests of Island Air rather than their own, "the bankruptcy . . . would not have occurred when it did (if it occurred at all)." *Id.* at 11.

Regardless, the Complaint alleges that prolonging Island Air's life significantly increased its liabilities and dissipated its assets, causing corporate harm. *See e.g.*, *id.* at 98–100 (stressing the "harm it caused Island Air"). Simply put, Plaintiffs allege that, had Island Air shut down sooner, it would not have needlessly dissipated assets or accumulated debts that could not be repaid to its creditors. *Id.* at 12. Victims of Au's and Marinelli's misconduct also included Island Air's employees, who were given little, if any, warning of the closure and who were not paid wages from the last pay period. *Id.* at 14.

In terms of formal legal claims, only a few are relevant to this Order: the Trustee claims that the "self-interested acts" of Island Air's ownerships groups— the Ohana Defendants acting through Marinelli and the Malama Defendants acting through Au—are to blame for allowing Island Air's assets to dissipate and its liabilities to increase over the period of a belatedly terminated death spiral. *See id.* at 96–105 (Counts VI through X). In essence, the Trustee claims that Defendants violated their fiduciary duties of care and loyalty to Island Air by keeping it on life support for personal and/or other improper motives, thereby depleting its assets and increasing its liabilities. *See id.*; *see also id.* at 9–12.

## B.    Duca's Opening and Rebuttal Reports

The Trustee employs a dual expert arrangement in support of damages for her breach of fiduciary duty claims. *See* ECF No. 81 at 9–10. The Trustee

retained Duca, a bankruptcy attorney, to testify on damages theories and ultimate damages amounts, while she retained Mr. Daniel Bowen, an accountant, to compile the financial data underlying Duca's testimony.  *Id.*

Duca prepared an opening report in which he states that "damages should be measured from the time when a reasonable and objective person controlling [Island Air], whose motivation was solely to promote the best interests of [Island Air], would have determined that shutting down was necessary to minimize further losses and to avoid incurring obligations to creditors that the Company had no ability to pay."  ECF No. 61-2 at 2–3; *see also id.* at 9 ("There being no imminent prospect for financial rehabilitation, the best interests of [Island Air] called for [Au] and the board to shut it down[.]").  As for specific dates, Duca opines that Island Air should have been shut down—i.e., the damages period should start— sometime between January 1, 2016 and July 1, 2016, although he acknowledges that the jury must ultimately determine that date.  *See id.* at 3, 11.  And he submits that the end date of the damages period should be November 2017, when Island Air entered Chapter 7 bankruptcy.  *See id.* at 3, 9.

As for how to calculate damages, Duca opines that damages can be calculated utilizing three alternative methods: (1) the change in Island Air's net worth; (2) the change in its liabilities; or (3) operating losses over the damages period.  *See id.* at 3, 9–11.  Of those damages theories, Duca considers the net

worth theory to be the "best reflective of the damages sustained by [Island Air]." *Id.* at 11.  Duca provides example calculations of damages under those theories using starting dates ranging from January 1, 2016 to July 1, 2016.  *Id.* at 3, 11. Although he ultimately relinquishes the date selection and damages calculations to the jury, Duca contends that Island Air became insolvent before or near the beginning of 2016.  *See id.* at 5, 7 n.6.  Notably, Duca makes clear that he cannot testify directly on breaches of fiduciary duties, *see id.* at 2, 6–10.  *See also id.* at 2 ("I will assume that the Plaintiffs can prove [the alleged breaches of fiduciary duties] and I will proceed to calculate the resulting damages sustained by [Island Air].").

Following his opening report, Duca prepared a rebuttal report in which he addresses critiques from Defendants' expert witnesses.  ECF No. 133-6.  He maintains his conclusion that Island Air should have been shut down in the first half of 2016.  *See id.* at 8 (citing evidence showing that Island Air was doomed to fail as of early 2016).  He opines on how Island Air had "insufficient capital to reverse its downward financial spiral as it continued to deplete its cash" from 2016–2017, *id.* at 14, and how the "2017 cash infusions at [Island Air]'s eleventh hour were the equivalent of providing a ventilator to briefly extend the lifetime of a terminally ill patient," *id.* at 15.  He also avers that because Island Air was an insolvent company without prospect for avoiding liquidation, he does not need to

account for intangible assets when valuing Island Air. *See id.* at 7–8, 10; *see also id.* at 4, 11–12 (opining that Defendants' investments in Island Air were "not enough to create a going concern" and that "going concern valuation methodology" is improper because Island Air "could not generate sufficient sales to pay its operating costs").

Perhaps most notably, Duca uses his rebuttal report to refine his damages theories; specifically, he offers two versions of his net worth theory. *See id.* at 17. The first calculates the change in Island Air's net worth by comparing the beginning and ending book values of Island Air's assets and liabilities. *See id.* This version resembles Duca's change in liabilities theory, as both rely exclusively on book values. *See* ECF No. 61-2 at 7 n.10. The second version calculates the change in net worth by computing the beginning net worth using liquidation values for the assets sold during the 2018 bankruptcy liquidation, along with book values for the other assets and for all liabilities, and then subtracting the per-quarter operating losses from that initial net worth until the end of the damages period. *See* ECF No. 133-6 at 17.

After refining his damages theories, Duca presents a date-value table containing valuation metrics at different times. *Id.* Duca intends for jurors to select values corresponding to the dates of any fiduciary violations and to calculate damages based on those selected values. *See id.* at 17–18.

11

## C.   The 2022 Daubert Order

Defendants challenged Duca's testimony with an initial round of *Daubert* motions to exclude.  ECF Nos. 61, 66.  Following a hearing on those motions, *see* ECF No. 108, the Court issued an order dated August 17, 2022 that granted in part and denied in part Defendants' motions to exclude Duca.  ECF No. 112 (the "2022 Daubert Order").  In that order, the Court found Duca to have the necessary knowledge and experience to testify in this case.  *Id.* at 14–15.  The Court also found Duca's testimony to be helpful to the jury.  *Id.* at 15–17.[4]

But the Court found Duca's testimony unreliable, at least for the time being, because he "fail[ed] to explain why his methodology yields a reliable measure of harm that Island Air purportedly suffered."  *Id.* at 18.  The Court agreed with Defendants that "any damages must measure harm to Island Air rather than harm to its creditors."  *Id.* at 22.  And "[t]o that end, the need for an expert to explain to a jury what harm Island Air suffered as distinct from any damage Island Air's creditors sustained seem[ed] crucial."  *Id.* at 23.  The Court described how "an expert could theoretically explain why the harm to Island Air and its creditors is exactly the same in this situation.  But that potential difference or similarity is exactly what Duca and Plaintiffs failed to explain or account for."  *Id.*

---

[4]  Additionally, the Court rejected Defendants' challenges to Mr. Bowen's testimony.  *See* ECF No. 112 at 27–29.

The Court also noted that the damages theories proposed by Duca typically "require[d] proof of specific itemized damages, such as increased liabilities and lost profits." *Id.* at 25.  And that "while the decrease in net value or increase in liabilities may very well be proper measures of damages to the Debtor, Plaintiffs [had] not met their burden of demonstrating that their expert has a reliable method for calculating those damages[.]" *Id.* at 26.

**D.    Duca's Supplemental Report**

Duca prepared a supplemental report to address the Court's concerns.  ECF No. 133-3.  Duca begins that report by stepping back from the details of his damages theories and explaining why Island Air was harmed in the first place.  In particular, he opines on how this is not a case where a corporation is harmed by an improper transaction or an injury to a specific asset, such as when a disloyal director usurps a corporation's business opportunity.  *See id.* at 2.  Instead, Duca says, this case is about "wrongfully prolonging corporate life," whereby a corporation is harmed by compounding its already existing distress through the depletion of its assets and increase in its liabilities.  *Id.* at 2, 4; *see also id.* at 4–5 ("The depletion of assets is obvious as a form of damages and requires little explanation. . . .  [T]he vast majority of the increases in liabilities correspond to a dissipation of assets[.]").  So according to Duca, "it is unnecessary to further 'parse' out harm to Island Air," given the injury alleged in this case.  *Id.* at 6; *see*

*also id*. at 7 ("It was not necessary for me to distinguish between harm to the corporation and resulting harm to the creditors caused by misconduct by corporate fiduciaries," "because harm to the corporation that indirectly affects creditors is still harm to the corporation that is recoverable by the corporation, and only the corporation, as damages." (footnote omitted)).

Duca thus explains that his change in net worth theory is most preferred because it incorporates both diminution in assets and increases in liabilities. *Id.* at 3. Duca admits that his change in liabilities theory is less preferred and that there is some caselaw suggesting that a mere increase in liabilities is not harmful to a company when the company later goes into bankruptcy and does not have to pay back the liabilities. *Id.* at 4; *see also id.* at 6 (maintaining his opinion that Island Air was not a "going concern" as of the beginning date of the damages period). Despite those admissions, Duca opines that his change in liabilities theory is a reliable measure of damages in this case. *See id.* at 4. But unlike with his change in liabilities theory, Duca does not attempt to support his operating losses theory as a standalone damages theory in his supplemental report. *See id.*

## E.    The Latest Motions to Exclude

Defendants renewed their objections to Duca's testimony by filing their Motions to Exclude and supporting briefing on January 27, 2023. ECF Nos. 133 and 133-1 (the Ohana Defendants' Motion and briefing); ECF No. 136 and 136-1

(the Malama Defendants' Motion and briefing).  Plaintiffs filed oppositions to the

Motions.  ECF Nos. 146 and 147.  And Defendants filed replies to the oppositions.

ECF No. 152 and 153.  On April 17, 2023, the Court entered a minute order

directing the parties to prepare to discuss at the upcoming hearing on the Motions a

few issues not fleshed out in the briefing.  *See* ECF No. 160.  The Court heard the

Motions on April 21, 2023.  ECF No. 162.

## II.    LEGAL STANDARD

Federal Rule of Evidence ("FRE") 702 governs the admissibility of expert

testimony.  *See Clausen v. M/V New Carissa*, 339 F.3d 1049, 1055 (9th Cir. 2003).

Experts may offer opinions based on their "knowledge, skill, experience, training,

or education" if the following requirements are met:

> (a) the expert's scientific, technical, or other specialized
> knowledge will help the trier of fact to understand the evidence
> or to determine a fact in issue;
>
> (b) the testimony is based on sufficient facts or data;
>
> (c) the testimony is the product of reliable principles and
> methods; and
>
> (d) the expert has reliably applied the principles and methods to
> the facts of the case.

Fed. R. Evid. 702.  The admissibility standard embodied by FRE 702 is flexible

and should be applied with a liberal thrust favoring admission.  *Wendell v.*

*GlaxoSmithKline LLC*, 858 F.3d 1227, 1232 (9th Cir. 2017).

15

In *Daubert*, the Supreme Court focused on the admissibility of scientific expert testimony, clarifying that FRE 702 controls the admissibility of such testimony through the conventional relevancy and reliability standards.  509 U.S. at 589.  Scientific expert testimony—like all other expert testimony—is relevant if it has a valid connection to the pertinent inquiry and reliable if the methodology underlying it has a reliable basis in the knowledge and experience of the relevant discipline.  *See id.* at 591–92; *Primiano v. Cook*, 598 F.3d 558, 565 (9th Cir. 2010).  The burden of proving relevancy and reliability rests with the proponent of the expert testimony.  *Lust by & through Lust v. Merrell Dow Pharms., Inc.*, 89 F.3d 594, 598 (9th Cir. 1996).  Notwithstanding that burden of proof, district courts have their own duty to ensure the reliability and relevancy of all expert testimony submitted to a jury.  *See Kumho Tire Co. v. Carmichael*, 526 U.S. 137, 148–49 (1999) (describing the "gatekeeping obligation" of district courts).

When assessing reliability, district courts have broad latitude in choosing their methods of assessment.  *Hangarter v. Provident Life & Acc. Ins. Co.*, 373 F.3d 998, 1017 (9th Cir. 2004).  *Daubert* outlines the following nonexclusive factors that may bear on determining the reliability of a particular scientific theory or technique:  "(1) whether the theory can be and has been tested, (2) whether the theory has been peer reviewed and published, (3) what the theory's known or potential error rate is, and (4) whether the theory enjoys general acceptance in the

applicable scientific community." *Murray v. S. Route Mar. SA*, 870 F.3d 915, 922 (9th Cir. 2017). "A district court may permissibly choose not to examine [the particular *Daubert*] factors that are not 'reasonable measures of reliability in a particular case.'" *Murray*, 870 F.3d at 922 (quoting *Kumho*, 526 U.S. at 153). And a district court may, of course, consider other factors pertinent to the reliability inquiry in a particular case. *See id.* at 924 (citing *Black v. Food Lion, Inc.*, 171 F.3d 308, 311–12 (5th Cir. 1999)).

## III.   DISCUSSION

The question here is whether Duca's testimony is reliable. The Court considers the third and fourth *Daubert* factors to be useful in assessing the reliability of Duca's testimony because, although not empirical, it is grounded in logic and math and is thus amenable to a modified version of *Daubert*'s scientific inquiry. And so the Court considers whether Duca's damages theories find support in damages jurisprudence and whether the error rates (accuracy) of Duca's theories are acceptable. The Court assesses those two factors under Delaware law, which controls the fiduciary duty claims in this case, *see, e.g.*, AP ECF No. 61 at 4.

Duca proposes two distinct but related damages theories: damages equaling the change in Island Air's net worth (which declined) and damages equaling the

change in Island Air's liabilities (which increased).[5]  Those changes are measured over the relevant time period, i.e., the period ending with Island Air's November 2017 shutdown and beginning on the date a loyal director would have shut down Island Air to avoid further losses and liabilities.

Duca does not opine on any breaches of fiduciary duties.  But he does opine on the possible dates a loyal director would have shut down Island Air, and theorizes that those possible dates followed the point at which Island Air turned insolvent and the point at which Island Air was no longer a going concern[6]— implicit but critical assumptions of his damages theories, as discussed below in Part III.A.2.  Duca accounts for variability in the relevant period by providing a

---

[5]  Because Duca does not attempt to support his operating losses theory in his supplemental report, the Court finds his testimony on that theory to be unreliable. The Court will not, therefore, discuss that theory in the remainder of this Order.

[6]  A company is a "going concern" when it has "sufficient resources to operate for the foreseeable future without the threat of liquidation."  *TCV VI, L.P. v. TradingScreen Inc.*, No. CV 10164-VCN, 2015 WL 1598045, at *6 (Del. Ch. Feb. 26, 2015), *aff'd sub nom. Cont'l Invs. Fund LLC v. TradingScreen Inc.*, 275 A.3d 754 (Del. 2022).

For purposes of this Order, the Court treats "not a going concern," "inevitable liquidation," "inevitable dissolution," and "inevitable closing" as one and the same. Those conditions capture the allegation that at some point in 2016, Island Air was doomed to Chapter 7 bankruptcy—and the accompanying shutdown, liquidation, and dissolution—regardless of any modifications to its operations.  Notably, "insolvency" is necessary but insufficient for those conditions.

date-value table from which jurors can select values corresponding to the dates of any fiduciary violations and calculate damages based on those values.

Defendants' challenges to the reliability of Duca's theories sort neatly into two buckets and align with the two reliability factors identified above.  The first bucket—which concerns damages jurisprudence and applies to both of Duca's damages theories—includes Defendants' argument that Duca's testimony should be barred as a matter of Delaware law because he proposes "deepening insolvency" damages, a theory of damages that Delaware courts have soundly rejected, according to Defendants.  The first bucket also includes Defendants' argument that Duca's testimony is unreliable because, as a matter of Delaware law, prolonging corporate life in the face of inevitable liquidation causes no harm to a corporation.  Finally, the first bucket also includes Defendants' argument that Duca's testimony is unreliable because Island Air actually benefitted from the delayed closing alleged in this case.  For the reasons provided below, the Court rejects those reliability challenges.

The challenges in the second bucket concern the accuracy, or error rates, of Duca's damages theories.  Some of those challenges are more discrete, e.g., that Duca's declining net worth theory erroneously uses liquidation values instead of true fair market values, while other challenges are more theoretical, e.g., that Duca's increasing liabilities theory does not isolate the harms allegedly suffered by

Island Air.  Because many of the accuracy challenges apply to only one theory or the other, the Court addresses those challenges in separate sections for each of Duca's damages theories.  For the reasons provided below, the Court rejects the accuracy challenges to Duca's declining net worth theory but sustains the accuracy challenges to Duca's increasing liabilities theory.  The Court thus finds his declining net worth theory reliable and his increasing liabilities theory unreliable.

**A.      The First Bucket—Reliability Challenges Relating to Damages Jurisprudence**

> **1.      Deepening insolvency damages under Delaware law**

The Ohana Defendants argue that Duca's damages theories are congruent with a "deepening insolvency" theory of damages.  As a technical matter, only Duca's declining net worth theory is truly a "deepening insolvency" theory.  If net worth is simply assets minus liabilities, and if insolvency exists when assets are less than liabilities, then decreasing the net worth of an already insolvent company will necessarily deepen its insolvency.  *See Quadrant Structured Prod. Co. v. Vertin*, 115 A.3d 535, 560 (Del. Ch. 2015) ("[A] corporation is insolvent under [the balance sheet] test when it has liabilities in excess of a reasonable market value of assets held."  (quotation marks omitted)); *Gibralt Cap. Corp. v. Smith*, No. 17422, 2001 WL 647837, at *8 (Del. Ch. May 9, 2001) (defining insolvency under a receivership statute to mean "assets below liabilities (i.e., a negative net worth)").  Yet, increasing the liabilities of an already insolvent company does not necessarily

deepen its insolvency because, as the Ohana Defendants argue elsewhere, taking on new debt "also increases . . . assets (in the form of cash) by an equal amount," at least temporarily offsetting that debt on the balance sheet.  ECF No. 133-1 at 15.  For that reason, Duca's increasing liabilities theory is not a true deepening insolvency theory, and so the Court's discussion here focuses on Duca's declining net worth theory.

Defendants argue that "Delaware courts have consistently rejected" a deepening insolvency theory of damages.  ECF No. 133-1 at 28–29.  That argument incorrectly asserts that Delaware courts have settled the issue of whether deepening insolvency is a viable damages theory.  As explained below, they have not—the decisions cited by the Ohana Defendants discuss deepening insolvency only as a theory of liability (a cause of action), not as a damages theory.  *See* 2022 Daubert Order, ECF No. 112 at 20 ("Neither the Delaware Chancery nor Supreme Courts have definitively said that deepening insolvency as a measure of damages is forbidden as a matter of law in all circumstances.").

To resolve the unsettled issue—whether deepening insolvency is a viable damages theory under Delaware law—this Court must predict how the Supreme Court of Delaware would rule.  Making that prediction involves analogizing this case to any relevant decisions from the Supreme Court of Delaware and the Court of Chancery of Delaware (the "Chancery Court"); it also involves weighing on-

point decisions from other jurisdictions, especially those interpreting and applying Delaware law.  *See Strother v. S. Cal. Permanente Med. Grp.*, 79 F.3d 859, 865 (9th Cir. 1996) ("[A] federal court must predict how the highest state court would decide the issue using intermediate appellate court decisions, decisions from other jurisdictions, statutes, treatises, and restatements as guidance."); *In re Exide Techs., Inc.*, 299 B.R. 732, 751 (Bankr. D. Del. 2003) ("To [predict state law], the Court must examine:  (1) what the Delaware Supreme Court has said in related areas; (2) the 'decisional law' of the Delaware intermediate courts; (3) federal appeals and district court cases interpreting the state law; (4) decisions from other jurisdictions that have discussed the issue we face here."  (citing *Wiley v. State Farm Fire & Cas. Co.*, 995 F.2d 457, 460 (3d Cir. 1993))).  This Court predicts that the Supreme Court of Delaware would accept deepening insolvency as a theory of damages.

### a.     *Supreme Court of Delaware decisions*

Relevant decisions from the Supreme Court of Delaware are few and far between.  Not a single decision discusses the concept of "deepening insolvency," either as a cause of action or damages theory.  And while the Supreme Court of Delaware affirmed a Chancery Court decision that refused to recognize deepening insolvency as a cause of action, *see Trenwick Am. Litig. Trust v. Billett*, 931 A.2d 438 (Del. 2007) (affirming *Trenwick Am. Litig. Trust v. Ernst & Young*, *L.L.P.*,

22

906 A.2d 168 (Del. Ch. 2006)), that affirmance came in the form of an unpublished disposition with no substantive analysis, *see* 931 A.2d 438, and the Chancery Court's decision did not address deepening insolvency as a damages theory, *see infra* Part III.A.1.b.[7]

There are, however, a couple of holdings from the Supreme Court of Delaware that when pieced together, indirectly support deepening insolvency as a viable damages theory.  First, there are decisions holding that, in the case of an insolvent corporation, derivative actions may be brought on behalf of the corporation for breaches of fiduciary duties causing harm to the corporation.  *See, e.g.*, *N. Am. Cath. Educ. Programming Found., Inc. v. Gheewalla*, 930 A.2d 92, 101–02 (Del. 2007) ("[C]reditors of an insolvent corporation have standing to maintain derivative claims against directors on behalf of the corporation for breaches of fiduciary duties.  The corporation's insolvency makes the creditors the principal constituency injured by any fiduciary breaches that diminish the firm's value." (footnote and quotation marks omitted)).  And second, there are of course decisions explaining that in a derivative action brought on behalf of a solvent corporation, the corporation is entitled to recover the loss in value caused by a breach of fiduciary duties.  *See, e.g.*, *Brookfield Asset Mgmt., Inc. v. Rosson*, 261

---

[7] This Court will refer to the Chancery Court's decision as the *Trenwick* decision.

A.3d 1251, 1262–63, 1266 (Del. 2021) ("The alleged economic dilution in the value of the corporation's stock is the unavoidable result of the reduction in the value of the entire corporate entity[.]"  And "[b]ecause a derivative suit is brought on behalf of the corporation, any recovery must go to the corporation."); *Kramer v. W. Pac. Indus., Inc.*, 546 A.2d 348, 351 (Del. 1988).

Putting the pieces together:  if in a derivative action a solvent corporation can recover the loss in value caused by a breach of fiduciary duties, and if derivative actions may be brought on behalf of an insolvent corporation for breaches of fiduciary duties, then the insolvent corporation should be able to recover the loss in value—its deepening insolvency or increasingly negative net worth—caused by the breaches of fiduciary duties.  In short, Supreme Court of Delaware caselaw indirectly supports deepening insolvency as an appropriate damages theory for breach of fiduciary duty claims brought on behalf of an insolvent corporation.  *Cf. Collins & Aikman Corp. v. Stockman*, No. CIV 07-265-SLR/LPS, 2009 WL 3153633, at *3 (D. Del. Sept. 30, 2009) (explaining how "deepening insolvency" is simply a form of economic loss encompassing "increased liabilities, decrease in fair asset value [and/or] lost profits of a corporation").

### b.    *Chancery Court decisions*

There are a few decisions from the Chancery Court addressing deepening insolvency; the Ohana Defendants cite one such decision.  *See* ECF No. 152 at 20 (citing *Trenwick*, 906 A.2d 168).  Those decisions reject deepening insolvency as a cause of action, but they are silent on deepening insolvency as a damages theory.

In *Trenwick*, the Chancery Court held that "Delaware law does not recognize [deepening insolvency] as a cause of action."  906 A.2d at 174.  The Court declined to follow *Official Community of Unsecured Creditors v. R.F. Lafferty*, 267 F.3d 340 (3d Cir. 2001)—a decision approving of deepening insolvency— while noting that "many of the decisions that seem to embrace the concept of deepening insolvency [(including *Lafferty*)] do not clarify whether the concept is a stand-alone cause of action or a measurement of damages (the extent of deepening) for other causes of action."  *Trenwick*, 906 A.2d at 207.  The Chancery Court also described how *In re CitX Corp., Inc.*, 448 F.3d 672 (3d Cir. 2006) had clarified *Lafferty* by confirming that *Lafferty* accepted a deepening insolvency cause of action but also by explaining that *Lafferty* had not accepted deepening insolvency as a damages theory.  *See Trenwick*, 906 A.2d at 207 n.108.

The Chancery Court's analysis of Third Circuit law is important because it makes clear that the Chancery Court was aware of the distinction between deepening insolvency as a theory of liability and deepening insolvency as a theory

of damages.  That awareness indicates that the Chancery Court's holding, "Delaware law does not recognize [deepening insolvency] as a cause of action," 906 A.2d at 174, should be interpreted literally, only to the breadth of its express language.

In *Quadrant*, the Chancery Court confirmed that "Delaware does not recognize the theory of 'deepening insolvency.'"  115 A.3d at 547 (citing *Trenwick*, 906 A.2d at 174); *see also id.* at n.17 ("Delaware law does not recognize this catchy term as a cause of action[.]"  (quoting *Trenwick*, 906 A.2d at 174)). The Chancery Court recited the *Trenwick* rule en route to its largely unrelated holding that a corporate creditor does not need to prove continuous insolvency in order to bring a derivate action against corporate directors.  *See id.* at 547–56. Nowhere in the *Quadrant* opinion does the Chancery Court consider extending the *Trenwick* rule to deepening insolvency damages theories.  *See id.*

So it's clear that neither *Trenwick* nor *Quadrant* address deepening insolvency as a damages theory.[8] Yet, if anything, the reasons given by the Chancery Court for rejecting a deepening insolvency cause of action support the conclusion that the Chancery Court would not reject a deepening insolvency damages theory per se, and especially not under the facts of this case.

The *Trenwick* decision reasons that "[e]ven when a firm is insolvent, its directors may, *in the appropriate exercise of their business judgment*, take action that might, if it does not pan out, result in the firm being painted in a deeper hue of red." 906 A.2d at 174 (emphasis added). The emphasized phrase implies that deepening insolvency could constitute a corporate harm if caused by inappropriate director actions, e.g., breaches of fiduciary duties. Indeed, the *Trenwick* decision later describes how rejecting deepening insolvency as a cause of action "does not absolve directors of insolvent corporations of responsibility"; "[r]ather, it remits

---

[8]  Another Chancery Court decision, *Shandler v. DLJ Merch. Banking, Inc.*, No. CIV.A.4797-VCS, 2010 WL 2929654 (Del. Ch. July 26, 2010), mentions "deepening insolvency." *See id.* at *13. But *Shandler*'s discussion of that term is too short and its holdings too fact-specific to be useful to this Court's analysis. *See id.* at *13–15 ("Likewise, I dismiss [plaintiff's] third and final category, his so-called 'deepening insolvency'-based fiduciary duty claim. . . . In the absence of any pled facts that plausibly support an inference that [the controlling directors] could rationally benefit from knowingly diminishing [the] enterprise value by purposely delaying bankruptcy when [they] knew that filing was the value maximizing option, I cannot conclude that the complaint pleads a claim for the breach of the duty of loyalty[.]").

plaintiffs to the contents of their traditional toolkit, which contains, among other things, causes of action for breach of fiduciary duty[.]"  *Id.* at 205.  Thus, if a breach of fiduciary duties increases corporate insolvency, and if that breach is actionable under Delaware law, it stands to reason that an appropriate damages remedy would track the decline in corporate value, i.e., the deepened insolvency, caused by the breach.  *See Collins*, 2009 WL 3153633, at *3; *cf. Trenwick*, 906 A.2d at 174 ("[D]eepening insolvency' is no more of a cause of action when a firm is insolvent than a cause of action for [mere] 'shallowing profitability' would be when a firm is solvent.").

The reasoning in *Quadrant* supports the same conclusion.  There, the Chancery Court provided further explanation for the *Trenwick* rule by describing how directors should not be held liable for "continuing to operate an insolvent entity *in the good faith belief* that they may achieve profitability, even if their decisions ultimately lead to greater losses for creditors."  *Quadrant*, 115 A.3d at 547 (emphasis added).  Again, the emphasized phrase implies that directors can be held liable for breaching fiduciary duties owed to an insolvent firm—the damages remedy would logically track the decrease in value caused by the directors, i.e., the deepened insolvency.

### c. *Decisions from other courts discussing deepening insolvency as a damages theory*

There are many decisions from outside the Delaware court system that address deepening insolvency as a damages theory. This Court's review of those decisions is not exhaustive; it focuses on the decisions cited by the parties, particularly those predicting Delaware law, and presents the strongest decisions supporting both sides.

The three strongest decisions supporting deepening insolvency as a damages theory are *Schacht v. Brown*, 711 F.2d 1343 (7th Cir. 1983); *In re Greater Southeast Community Hospital Corp. I*, 353 B.R. 324 (Bankr. D.D.C. 2006) ("*Tuft*"); and *In re The Brown Schools*, 386 B.R. 37 (Bankr. D. Del. 2008) ("*McCown*"). The three strongest decisions opposing deepening insolvency as a damages theory are *In re CitX Corp., Inc.*, 448 F.3d 672 (3d Cir. 2006); *In re Troll Communications, LLC*, 385 B.R. 110 (Bankr. D. Del. 2008); and *In re Radnor Holdings Corp.*, 353 B.R. 820 (Bankr. D. Del. 2006). The Court finds the former group to be more persuasive.

In *Schacht*, the directors of an insolvent company were alleged to have wrongfully prolonged the company's life through, among other things, mail fraud, causing the company to drain over $3 million in assets and to squander its most profitable business line, thereby deepening the company's insolvency. 711 F.2d at

1350.  The appellee-plaintiffs clothed their allegations in a civil RICO[9] claim, requesting damages for the "deepening of [the company's] insolvency."  *Schacht*, 711 F.2d at 1350.  Applying Illinois law, the Seventh Circuit rebuffed appellants' argument that a party "may never sue to recover damages alleged to have resulted from the artificial prolongation of an insolvent corporation's life."  *Id.*  That argument, according to the court, "collide[d] with common sense, for the corporate body is ineluctably damaged by the deepening of its insolvency."  *Id.*  The court emphasized that "the 'asset dissipation' alleged was not only that which resulted from the normal operation of the business, as in the cases cited by the [appellants], but also that which resulted from the bleeding of [the company] which was a part of the underlying scheme to defraud."  *Id.* (footnote omitted).

In contrast, the Third Circuit appeared to hold in *CitX* that "deepening insolvency is not a valid theory of damages for negligence" under Pennsylvania law.  448 F.3d at 681.  The pertinent claim alleged that the auditor-appellees were negligent in preparing a financial statement ultimately used to procure a $1 million equity investment for the debtor corporation, CitX, which prolonged its existence, thereby causing it to accrue millions in additional debt and "dramatically deepen[ing] [its] insolvency."  *Id.* at 676–77.

---

[9] "RICO" is the Racketeer Influenced and Corrupt Organizations Act of 1970, 18 U.S.C. §§ 1961–1968.

The Third Circuit first clarified that its prior decision in *Lafferty* was silent on the issue of whether deepening insolvency was a viable damages theory. *See CitX*, 448 F.3d at 677. The court then explained how the appellant's deepening-insolvency theory of damages was tantamount to impermissible "hindsight bias": the $1 million investment "did nothing to 'deepen' CitX's insolvency." *Id.* "It did the opposite," as "[i]nsolvency decreased rather than deepened." *Id.* CitX's management "could have instead used that opportunity to turn the company around and transform it into a profitable business," but "[t]hey did not, and therein lies the harm to CitX." *Id.* at 678. The court thus rejected appellant's damages theory because "the deepening of [CitX's] insolvency [was] not an independent form of corporate damage." *Id.*

Significantly, the Third Circuit's later decision in *Thabault v. Chait*, 541 F.3d 512 (3d Cir. 2008), calls *CitX*'s holding into doubt. *Thabault* clarifies that "*CitX* does not support [the] proposition" that "recovery is not permissible" "[w]hen a plaintiff brings an action for professional negligence" and seeks damages for "an injury to the [d]ebtor's corporate property from the fraudulent expansion of corporate debt and prolongation of its corporate life." *Thabault*, 541 F.3d at 520.

In any event, this Court is more persuaded by the reasoning in *Schacht* than in *CitX*. To begin with, the Court is not entirely sure whether *CitX* actually holds

that deepening insolvency is an improper damages theory.  *See Thabault*, 541 F.3d

at 521 (framing *CitX*'s holding as a causation ruling, where "the ultimate harm [of

deepened insolvency] was caused by mismanagement, not the auditor").  More

importantly, the Court disagrees with *CitX* that deepening insolvency damages rely

on impermissible "hindsight bias," which the Court interprets as a reference to the

principle that directors should not be liable for merely taking actions that happen to

turn out poorly for the corporation.  If directors are held liable for merely making

poor business decisions—e.g., a reasonable investment that doesn't quite pan out—

then "deepening insolvency" serves not only as a damages theory but also as a

cause of action, as there would be no other hook for legal liability.

A deepening insolvency "damages theory" assumes, however, that there is a

separate theory of liability to which the damages theory can apply.  In other words,

with a separate liability hook in place, "deepening insolvency" simply becomes a

form of compensatory damages intended to remedy an established legal wrong—

e.g., breach of fiduciary duties—by estimating economic loss in the form of

declining corporate value.  The analysis in *Schacht* is consistent, as it highlights the

"scheme to defraud" on which the deepening insolvency damages were based.

The second decision supporting deepening insolvency damages, *Tuft*,

provides a more thorough analysis that also declines to follow *CitX*:

> [T]his court [is not] aware of any common law principle holding
> that an injury sustained as a result of one tort (fraud) is somehow

32

not an injury when it is caused by a different tort (negligence), as the *CitX* court seems to suggest. The cause of an injury might determine whether a tort occurred, but it does not determine whether the injured person suffered an injury in the first place. . . .

The *Lafferty* court, [unlike the *CitX* court], did not fix its star upon the notion that deepening insolvency was a tort. Instead, it concluded that the accumulation of debt by an insolvent entity could, in certain circumstances, be harmful to the corporation. *Lafferty*, 267 F.3d at 349–50. These injuries can occur as a result of management's negligence just as easily as they can due to management's fraud. . . .

[T]his court prefers to treat deepening insolvency as the theory of harm that it was always meant to be, and will rely on other, more established (not to mention less convoluted) common law causes of action to ascertain whether the defendants in this case have engaged in a legal wrong for which [plaintiff-trustee] is entitled to recover.

*Tuft*, 353 B.R. at 337–38 (appearing to apply District of Columbia law[10]).

The third decision supporting deepening insolvency damages is *McCown*, 386 B.R. 37. There, the United States Bankruptcy Court for the District of Delaware found *Tuft*'s analysis to be persuasive and held that deepening

---

[10]  The *Tuft* court stated that "deepening insolvency will remain a viable theory of damages in [the District of Columbia]" "until [the] court is told differently by a higher court in its own circuit." 353 B.R. at 338. And in a prior order in the same case, the court described how "[t]he District of Columbia courts have not yet recognized a cause of action for deepening insolvency." *In re Greater Se. Cmty. Hosp. Corp.*, 333 B.R. 506, 517 (Bankr. D.D.C. 2005); *see also id.* at 523 n.14 (holding that because the debtor was incorporated in Delaware, Delaware law defined "the fiduciary duties of its officers and directors," but not mentioning what law controlled damages theories).

insolvency is a viable damages theory for a claim governed by Delaware law. *See McCown*, 386 B.R. at 43, 47–48. The bankruptcy court also interpreted *Trenwick* consistent with this Court's reading, above. *Compare supra* Part III.A.1.b, *with McCown*, 386 B.R. at 46–47.

The second and third decisions opposing deepening insolvency damages, *Troll Communications* and *Radnor*, do little to rebut the persuasiveness of *Schacht*, *Tuft*, and *McCown*. In *Troll Communications*, the bankruptcy court concluded that "deepening insolvency ha[d] been rejected as a valid cause of action or a theory of damages under Delaware law." 385 B.R. at 122. But the bulk of the court's analysis focused on whether deepening insolvency was a viable a cause of action, not a viable damages theory. *See id.* at 121–22. In the analysis that did concern deepening insolvency damages, the court considered only the *CitX* decision and an academic article when reaching its conclusion that Delaware law precluded deepening insolvency damages. *See id.* The bankruptcy court's analysis in *Radnor* is equally terse and also relies principally on *CitX* when rejecting deepening insolvency damages. *See* 353 B.R. at 849.

### d. *Weighing the results of the factor test and making a prediction*

In sum, the prediction analysis indicates that the Supreme Court of Delaware would accept deepening insolvency as a damages theory. The reasoning provided by the Delaware courts in various opinions indirectly supports that conclusion, and

34

the more relevant analyses provided in *Schacht*, *Tuft*, and *McCown* are considerably more persuasive than the analyses provided in *CitX*, *Troll Communications*, and *Radnor*.  The Court thus rejects the Ohana Defendants' contention that Duca's deepening insolvency damages (his declining net worth theory) should be barred as a matter of Delaware law.

### 2.     Corporate harm from prolonging corporate life in the face of inevitable liquidation

As another reliability challenge relating to the damages jurisprudence, the Ohana Defendants argue that "when liquidation is inevitable, any delay in filing for bankruptcy causes no additional harm to the corporation; it harms only the corporation's creditors."  ECF No. 133-1 at 23.  Prolonging the inevitable termination of corporate life, the Ohana Defendants say, "add[s] insult only to death."  *Id.* (quoting S. Willett, "The Shallows of Deepening Insolvency," 60 Bus. Law at 566).  The Malama Defendants similarly argue that Duca "purports to measure nothing more than some metaphysical theoretical harm or injury to the Debtor, but not any ACTUAL harm suffered by the Debtor."  ECF No. 136-1 at 14.

Defendants' arguments challenge as a matter of law the critical assumption underlying Duca's damages theories, i.e., that an inevitably defunct business can suffer harm when its insolvency increases.  That assumption is tacit throughout Duca's reports.  *See, e.g.*, Duca's Opening Report, ECF No. 61-2 at 9 (reasoning

that the relevant damages period begins on the date a loyal director would have shut down Island Air, the date at which there was "no imminent prospect for financial rehabilitation"); Duca's Supp. Report, ECF No. 133-3 at 6 (reasoning the same, and describing how Island Air was "not a going concern" and was harmed by the "further deterioration in [its] finances and increased liabilities"); Duca's Rebuttal Report, ECF No. 133-6 at 15 ("The 2017 cash infusions . . . were the equivalent of providing a ventilator to briefly extend the lifetime of a terminally ill patient.").  According to Defendants, Duca's assumption is legally wrong because although creditors are harmed by increasing the insolvency of a corporation that will inevitably dissolve (the odds of collection decrease), the insolvent corporation suffers no related harm.

But Defendants' point is refuted by Delaware law that makes clear that an insolvent corporation's interests are bound up with its creditors' interests.  As the Supreme Court of Delaware explained in *Gheewalla*, creditors are the "principal constituency" injured by an insolvent firm's loss in value:

> It is well settled that directors owe fiduciary duties to the corporation.  When a corporation is solvent, those duties may be enforced by its shareholders. . . .  When a corporation is insolvent, however, its creditors take the place of the shareholders as the residual beneficiaries of any increase in value.
>
> Consequently, the creditors of an insolvent corporation have standing to maintain derivative claims against directors on behalf of the corporation for breaches of fiduciary duties.  The

> corporation's insolvency makes the creditors the principal
> constituency injured by any fiduciary breaches that diminish the
> firm's value.

930 A.2d at 101 (footnotes and quotation marks omitted).

The court's description of creditors as a "constituency" was not meaningless semantics.  Elsewhere in *Gheewalla*, the court described how directors have a duty to maximize the value of an insolvent corporation "for the benefit of all those having an interest in it" and how creditors could "protect their interest by bringing derivative claims on behalf of the insolvent corporation." *Id.* at 103; *see also Constituent*, *Black's Law Dictionary* (11th ed. 2019) ("One part of something that makes up a whole; an element.").  The Chancery Court has similarly explained that "directors of an insolvent firm do not owe any particular duties [directly] to creditors" but they do "owe fiduciary duties to the corporation for the benefit of all of its residual claimants, a category which [after *Gheewalla*] includes creditors." *Quadrant*, 115 A.3d at 547.

To be clear, saying that the insolvent corporation's interests are bound up with its creditors' interests does not mean that the corporation and its directors are duty-bound to follow the will of its creditors.  That duty seems to be the exception rather than the norm.  *See Prod. Rsch. Grp., L.L.C. v. NCT Grp., Inc.*, 863 A.2d 772, 787, 798 (Del. Ch. 2004) (explaining the "realities" behind "directors tak[ing] on a fiduciary relationship to the company's creditors" during insolvency: "[s]o

37

long as the directors honor the legal obligations they owe to the company's creditors *in good faith*, as fiduciaries they may pursue the course of action that they believe is best for the firm and its stockholders" (emphasis added)).

This case is exceptional in the sense that Duca's theories assume that Island Air was insolvent *and* doomed for dissolution.  In such a scenario, the "primar[y] focus[] on generating economic returns that will . . . deliver a return to the [shareholders]," *id.* at 787, falls off the table, making the creditors' interest in preserving corporate value the chief remaining interest.  That interest would hardly be honored "in good faith" by prolonging corporate life and spending assets on futile business endeavors.  In that way, the "good faith" standard is just legal jargon for the common-sense idea that directors should not be free to fritter away the assets of an unavoidably shuttering enterprise, particularly at the expense of legitimate interest holders.

The Ninth Circuit applied that common sense in *Smith v. Arthur Andersen LLP*, 421 F.3d 989 (9th Cir. 2005), when finding a cognizable harm to support the trustee's breach of fiduciary duty claims.  There, the trustee claimed that the defendants breached their fiduciary duties by wrongfully prolonging corporate life, causing the debtor to be "encumbered with additional debt obligations that it had no realistic chance of repaying" and causing the debtor's assets to be "squandered on an unviable business plan."  *Id.* at 995.  The court focused on the latter when

holding that the plaintiff had Article III standing:  if assets are spent on a "failing business," that "wrongful expenditure . . . qualifies as an injury to the firm which is sufficient to confer standing upon the [t]rustee."  *Id.* at 1003; *see also id.* at 1004 ("We rely only on the dissipation of assets in reaching the conclusion that [the debtor] was harmed.").  The court further explained that although "the dissipation of assets limited the firm's ability to repay its debts in liquidation," "[a]cknowledgment of [that] fact is not, however, a concession that only the creditors, and not [the debtor] itself, have sustained any injury."  *Id.* at 1004. "[P]oor decisions by directors that lead to a loss of corporate assets [of an insolvent firm] and are alleged to be breaches of equitable fiduciary duties remain harms to the corporate entity itself."  *Id.* at 1005–06 (quoting *Prod. Res. Group*, 863 A.2d at 792).

In short, the Court agrees with Duca's assumption of harm.  An inevitably defunct business can be harmed by increasing its insolvency due to the needless dissipation of assets[11] and blatant disregard for the rights of its creditors (the

---

[11]  That "dissipation" was allegedly "needless" in the sense that it serviced the operations of a futile business that should have been terminated at an earlier date. The Ohana Defendants' contention on pages 18 through 19 of their brief, ECF No. 133-1, that director liability exists only if assets were "misused" or "squandered" on specific transactions, thus misunderstands the allegations in this case.

principal constituency), beneficiaries, and interest holders of the insolvent corporation.  Defendants' matter-of-law challenge is therefore rejected.

### 3.    Actual harm to Island Air from the delayed closing

The last of Defendants' reliability challenges relating to the damages jurisprudence is their challenge to the factual predicate of Duca's testimony, that Island Air was harmed by the delayed closing alleged in this case.

The Ohana Defendants argue that Island Air actually benefited from the delayed closing because its employees remained gainfully employed and its customers continued to use its services in healthy competition with other airlines. ECF No. 133-1 at 10.  Even the shareholders suffered no harm, according to the Ohana Defendants, because if Island Air was truly insolvent during the relevant period, then the shareholders' investments had already bottomed out at zero, leaving them unaffected by any the further decline in corporate value.  *Id.*

For the purposes of this Order, it is enough to conclude that the Ohana Defendants simply raise an issue of fact with Duca's theory of harm:  whether Island Air was harmed by the delayed closing, considering the balance of the interests of its various constituencies, and also the dissipation of its assets, *see Arthur Andersen*, 421 F.3d at 1004.

The Malama Defendants argue that "a reasonable person could not [have] determine[d] whether Island Air incurred damages and/or should have been shut

down between 2015 and 2017" given Duca's testimony that operating losses fluctuated during that time.  ECF No. 136-1 at 26.  But that argument, like the Ohana Defendants' argument above, merely raises a fact issue with Duca's testimony.  Particularly, it raises a triable issue as to whether a loyal fiduciary would have shut down Island Air during the relevant period considering all the relevant data, including operating losses.  *See* Duca's Supp. Report, ECF No. 133-3 at 6 ("Ultimately it is the jury's decision to determine when the date when [sic] the alleged breaches first occurred—i.e., when the fiduciaries knew or should have known that Island Air . . . was not a going concern . . . and that further prolongation of Island Air's operations would produce further deterioration in Island Air's finances and increased liabilities.").[12]

The Court therefore rejects Defendants' challenges to the factual predicate of Duca's testimony because they merely raise issues of fact that cannot be resolved at this stage.  Having considered and rejected all of Defendants' reliability

---

[12]  The Malama Defendants also argue that Duca's testimony is flawed because he "fails to identify specifically what 'self-interest' the [Defendants] allegedly pursued that caused them to allegedly breach their fiduciary duty of loyalty."  ECF No. 136-1 at 12.  That argument, too, raises a fact issue with Duca's testimony that must be resolved at trial, likely through the testimony of other witnesses.  *See* Duca's Opening Report, ECF No. 61-2 at 2 ("I also have not been asked to evaluate whether Mr. Au's actions or those of his colleagues breached a fiduciary duty of loyalty to Island Air.  I will assume that the Plaintiffs can prove this[,] and I will proceed to calculate the resulting damages sustained by the Company.").

challenges in this section, the Court finds that Plaintiffs have met their burden of showing that Duca's damages theories are adequately supported by the damages jurisprudence.

**B.     The Second Bucket—Reliability Challenges Relating to Accuracy and Error Rates**

**1.     Accuracy challenges to Duca's declining net worth theory**

Defendants make various challenges to the accuracy of Duca's declining net worth theory.  The Court starts with the more discrete challenges.

### *a.     Discrete challenges to the accuracy of the net worth theory*

The Ohana Defendants argue that Duca's net worth theory is inaccurate because he either does not attempt to use fair market values in that theory or, even if he does, his attempt is flawed by not using actual fair market values.  *See* ECF No. 133-1 at 11–14.  The latter half of that argument targets Duca's net worth calculations that use liquidation values as proxies for fair market values. Particularly, for the assets sold during the 2018 bankruptcy liquidation, Duca uses the liquidation values of those assets and the book values of the remaining assets to estimate Island Air's net worth at the beginning of the damages period.  That approach is erroneous, according to the Ohana Defendants, because true fair market value assumes a company is a going concern and thus valuates assets using empirical indicators like "market transactions, discounted cash flow, enterprise value, etc." *Id.* at 12.

The Ohana Defendants cite Delaware caselaw in support of their argument, *see id.* at 12–14, but the cited cases do not square with this case.  In particular, the cited cases do not find calculations such as Duca's net worth calculations—which calculate changes in values over accounting periods—to be improper, because those cases concern whether using liquidation values in a same-time, snapshot comparison is improper.  *See Rosenblatt v. Getty Oil Co.*, 493 A.2d 929, 942 (Del. 1985) (noting, in a merger lawsuit, that "a company [should be] valued as a going concern, not on what can be obtained by its liquidation," when determining a fair stock price to compare with the price paid); *In re Radiology Assocs., Inc. Litig.*, 611 A.2d 485, 496 (Del. Ch. 1991) (same, citing *Rosenblatt*, 493 A.2d at 942); *In re Rural/Metro Corp. S'holders Litig.*, 102 A.3d 205, 224 & n.8 (Del. Ch. 2014) (comparing, in a merger lawsuit, the fair value of shares held by class members against the purchase price of those shares, and noting that "when determining the stock's 'true value' for purposes of compensatory damages [comparisons], the stock is to be evaluated on a going-concern basis and not on a liquidation basis" (citation and quotation marks omitted)).

So the Ohana Defendants' challenge falters because it fails to account for the fact that Duca's net worth theory calculates a change over time.  Specifically, for the version of Duca's net worth theory that uses liquidation values, the net worth estimated at the beginning of the damages period is decreased by the quarterly

losses (expenses exceeding revenues) until the end of the damages period, and the ending net worth is compared with the beginning net worth to yield the damages amount.  Looking closely at that version reveals that it is the repeated subtraction of quarterly losses that is determinative of the damages amount, not any alleged inaccuracies in the beginning net worth calculation.

For example, the initial net worth estimate could be inaccurate by overvaluing Island Air at $10 million or undervaluing Island Air at $1 million, but that inaccuracy is largely immaterial to the decline in net worth over, say, a seven-quarter period because the decline is a function of actual monies spent exceeding actual monies received, i.e., aggregate losses, and because the monies spent and received are mostly independent of the initial, inaccurate valuations.

Granted, aggregate losses are not entirely independent of initial valuations. A component of loss is expenses, and expenses include indirect expenses like quarterly depreciation that, depending on the depreciation formula applied, could increase or decrease based on the initial valuation of an asset.  But notably, the Ohana Defendants do not explicitly argue that Duca's net worth theory is unreliable because he calculates quarterly expenses with a base of liquidation values.  Nor would such an argument succeed because the main driver of Island Air's operating losses was monies dispersed from loans.  *See also* Duca's Supp.

44

Report, ECF No. 133-3 at 5 ("[T]he vast majority of the increases in liabilities correspond to a dissipation of assets[.]").[13]

Even assuming that Duca's beginning net worth valuation might materially influence the aggregate operating losses, the Ohana Defendants' challenge also falters on the invalid assumption that liquidation values are less accurate than fair market values[14] for valuing Island Air's assets.  The cases cited by the Ohana Defendants, above, were merger-objection cases in which there were no allegations that the merged entity was irretrievably insolvent or doomed to fail.  Because the merging entities were not doomed to fail, the courts appropriately valued those entities at fair value, under the assumption that those entities were a going concern. *See, e.g.*, *In re Rural/Metro*, 102 A.3d at 224–25.

But here, Duca assumes that Island Air was not a going concern at the beginning of the relevant damages period.  *See* Duca's Supp. Report, ECF No. 133-3 at 6.  And if a business is not a going concern, it is more appropriate to value

---

[13]  The Trustee's counsel represented during the April 21, 2023 hearing that the net worth damages calculation is driven by Island Air's taking on millions in liabilities and spending the corresponding monies, not by the amount of depreciation in the assets existing at the beginning of the damages period.

[14]  A fair market value is "the price which would be agreed upon by a willing seller and a willing buyer without any compulsion upon the seller to sell or the buyer to buy."  *State ex rel. Sec'y of Dep't of Highways & Transp. v. Davis Concrete of Del., Inc.*, 355 A.2d 883, 886 (Del. 1976).

that business with liquidation values than with fair market values.  *See In re Am. Classic Voyages Co.*, 367 B.R. 500, 508 (Bankr. D. Del. 2007) ("Before the going concern valuation is to be abandoned, the business must be wholly inoperative, defunct or dead on its feet."  (citation and quotation marks omitted)), *aff'd sub nom. In re Am. Classic Voyages, Co.*, 384 B.R. 62 (D. Del. 2008); *In re Adler, Coleman Clearing Corp.*, 247 B.R. 51, 111 (Bankr. S.D.N.Y. 1999) ("[W]here a company is on its deathbed, we will value its assets according to what could be obtained at a liquidation sale and not give them a going concern value."  (citation and quotation marks omitted)), *aff'd*, 263 B.R. 406 (S.D.N.Y. 2001); *cf. In re Tesla Motors, Inc. S'holder Litig.*, No. CV 12711-VCS, 2022 WL 1237185, at *40 (Del. Ch. Apr. 27, 2022) (deciding, in a stock-for-stock merger case, to "set[] aside [the issue] whether net liquidation value is a proper methodology to value [the acquired entity], a point the parties dispute[d]," and where an expert opined that the entity was not a going concern).  Of course, the question of when Island Air ceased being a going concern will be a central issue for the jury to decide, and Duca's assumption in this regard is fair game for cross examination.

It may have been most accurate for Duca to provide a more contemporaneous estimate of liquidation values for a damages period beginning in 2016, rather than using liquidation values from 2018.  But as the Trustee's counsel suggested at the April 21 hearing, estimating liquidation values in such a

retrospective manner may be extremely difficult or even impossible.  The Court

does not demand that amount of accuracy from Duca's methodology.  *See Jackson*

*v. E-Z-GO Div. of Textron*, Inc., 326 F. Supp. 3d 375, 412 (W.D. Ky. 2018)

("*Daubert* and Rule 702 do not require perfection.").

Defendants also argue that Duca's net worth theory is inaccurate because in

certain situations he does not even attempt to use fair market values.  *See* ECF No.

133-1 at 11–14, 19–20; ECF No. 136-1 at 13–14 (attacking depreciation and

amortization, the concepts behind book value).  That argument targets Duca's net

worth calculations that use book values for liabilities and assets; it also targets

Duca's net worth calculations discussed above that use liquidation values for select

assets and book values for liabilities and other assets.  *See* ECF No. 133-1 at 14

("Net worth figures, based on book value, are not a reliable measure of harm to

Island Air[.]").

But Defendants repeat the mistake of relying on caselaw that cautions

against using anything other than fair values (e.g., book values) for a snapshot

damages comparison.  *See* ECF No. 133-1 at 12 (citing *In re TransCare Corp.*, No.

20-CV-06274 (LAK), 2021 WL 4459733 (S.D.N.Y. Sept. 29, 2021)).  In

*TransCare*, the plaintiff challenged a foreclosure sale as being made at an unfair

price, and the court held that book value could not be used to establish the fair

price of that sale.  2021 WL 4459733, at *11.  The court even clarified that it was

47

rejecting book value because "[b]ook value tends to undervalue a business as a going concern" and "because [book value] does not fully account for intangible value attributable to the operations." *Id.* Those clarifying statements distinguish *TransCare* from this case, where Duca assumes Island Air had no valuable intangible assets as an inevitably dissolving business and where Duca is calculating changes in values over accounting periods, not comparing values at a single point in time.

And although the Court agrees with Plaintiffs that valuing certain Island Air assets with liquidation values is most accurate (i.e., the "preferred measure," ECF No. 146 at 17), that does not mean that valuing those assets with book values is unacceptable. Book value is a traditional accounting metric through which value is estimated using "depreciation or appreciation as computed upon an originally determined base." *DeFazio v. Hollister Emp. Share Ownership Tr.*, 406 F. Supp. 2d 1085, 1088 n.2 (E.D. Cal. 2005). While that traditional metric may be erroneous when valuing a going-concern business, that is not what Duca is doing here. He is instead valuing a business that he asserts was not a going concern and, in one version of his net worth theory, he does so using book values on both sides of a decline in net worth calculation, tending to minimize any inaccuracy that might seep into the book values of assets that have been on the books for many years. For example, if a certain physical asset had been on Island Air's books for

20 years before the start of the relevant damages period, that book value may be inaccurate due to, e.g., assumed straight-line depreciation.  But because Duca compares that starting book value with the ending book value—a value that carries forward the initial inaccuracy—that initial inaccuracy cancels out of Duca's damages calculation.

Moreover, because the comparison period in this case is relatively short—at most, 23 months—any inaccuracy that might be introduced by comparing book values over that change in time is likely insignificant.  Defendants are free to cross-examine Duca on his use of book values, but that usage does not constitute unacceptable error under FRE 702 and *Daubert*.  *See Alaska Rent-A-Car, Inc. v. Avis Budget Grp., Inc.*, 738 F.3d 960, 970 (9th Cir. 2013) ("Avis challenges three aspects of the witnesses['] testimony: using Alamo as the comparator, using the national rather than the Alaska market as a baseline, and extrapolating from the Juneau market to the entire Alaska market. . . .  [Those challenges] all go to the weight of the testimony and its credibility, not its admissibility.").

The Court has also considered Defendants' argument that Duca's net worth theory is flawed because he values Island Air's liabilities using book values as well, *see, e.g.*, ECF No. 133-1 at 19–20, and the Court rejects that argument for the same reasons it rejects Defendants' argument concerning Duca's valuing Island Air's assets with book values.  Both arguments can, however, be stored in

49

Defendants' armory for future use during cross-examination.  *See Alaska Rent-A-Car*, 738 F.3d at 970.

Lastly, the Malama Defendants attack Duca's net worth theory using arguments that they did not raise during the prior round of motions to exclude: Duca fails to exclude post-petition claims, ECF No. 136-1 at 18–21; Duca fails to consider off balance sheet assets, *id.* at 23–24; and Duca improperly ignores the effect of COD income and expenses, *id.* at 27–29.  Those arguments are waived because they could have been raised against Duca's Opening and Rebuttal Reports but were not.[15]  *See Questar Pipeline Co. v. Grynberg*, 201 F.3d 1277, 1289–90 (10th Cir. 2000) ("A party may waive the right to object to evidence on *Kumho/Daubert* grounds by failing to make its objection in a timely manner.").

---

[15]  Some of those arguments focus on Duca's testimony from a supplemental deposition that occurred after the Malama Defendants' initial motion to exclude and after the Court's 2022 Daubert Order.  *See, e.g.*, ECF No. 136-1 at 19–20.  But that deposition testimony did not raise new theories or provide new opinions absent from Duca's prior reports and testimony, such that it could provide a new basis for attack in the Malama Defendants' subsequent Motion.  Instead, that testimony concerned alleged errors that already existed in Duca's theories and that the Malama Defendants could have attacked in their initial motion.  *See, e.g.*, ECF No. 136-4 at 9 (deposition question asking Duca to clarify the book values that he uses in his net worth theory).  Moreover, when the Court reopened expert discovery so that Duca could supplement his report and his deposition testimony, the Court specified that the reopening intended to give Duca and Plaintiffs the opportunity to "answer questions and concerns the [Court] had about Duca's reports" in the 2022 Daubert Order.  ECF No. 118 at 2–3; *see also* ECF No. 127.

And even considering those arguments, the Court finds that they do not raise issues with Duca's net worth theory that amount to unacceptable error.

        **b.**    ***Theoretical challenges to the accuracy of the net worth theory***

On the more theoretical side of the fence, Defendants argue that Duca's declining net worth theory is inaccurate because he fails to adequately parse out the harm that Island Air purportedly suffered due to the alleged breaches of fiduciary duties.  ECF No. 133-1 at 25–28; ECF No. 136-1 at 11–12 ("Mr. Duca defiantly contradicts the Court's criticism and asserts that 'it is unnecessary to further 'parse' out the harm to Island Air.'"  (quoting Duca's Supp. Report, ECF No. 133-3 at 6)).

It is true that in the 2022 Daubert Order, the Court criticized Duca for apparently making no attempt to parse out the harm that Island Air suffered because of Defendants' alleged breaches.  ECF No. 112 at 25.  But in rendering that criticism, the Court noted the possibility that parsing out harms may be unnecessary under Duca's net worth theory.  *See id.*  If so, Duca simply needed to explain why that was the case.  *Id.*

He does so in his latest report.  He explains how Plaintiffs' theory of liability in this case is that Defendants—specifically Au and Marinelli—should have realized that Island Air was doomed to fail and, had they not been disloyal by acting in their own self-interests, would have shut down the business sooner rather than later.  ECF No. 133-3 at 6.  The theory of harm, as Duca explains it, is that

Island Air's life was wrongfully prolonged, causing the needless dissipation of assets and the incurrence and deepening of liabilities it could not pay back. *Id.* It makes sense then, according to Duca, that the measure of damages in such a case would account for the both the decrease in assets and increase in liabilities, and that those damages would be measured over the period in which Island Air's life was prolonged. *See id.*

The Court agrees with Duca's explanation that the most reasonable theory of damages in this case, given Plaintiffs' theories of liability and harm, is the net decline in assets and increase in liabilities over the relevant period, i.e., the change in "net worth." That theory of damages is tailored directly to the corporation itself, not merely to its creditors or its shareholders (who effectively have no interest because of irretrievable insolvency). That theory of damages also accounts for Plaintiffs' theory that as of the date Defendants should have shut down Island Air, all further asset expenditures and debt incurrences were improper and harmful. There is thus no reason to further "quantify the impact of the debt accumulated by [Island Air] due to the defendants' actions on [Island Air's] business operations," ECF No. 133-1 at 22 (quoting *Tuft*, 353 B.R. at 338).

In sum, the Court finds that Duca has adequately explained his declining-net worth theory of damages. That theory finds support in the damages jurisprudence and has an acceptable error rate. It is therefore reliable under FRE 702 and

*Daubert*.  Defendants' requests to exclude Duca's testimony on that theory are denied.

### 2.    Accuracy challenges to Duca's increasing liabilities theory

Defendants also challenge the accuracy of Duca's increasing liabilities theory of damages.  Plaintiffs oppose that challenge because, among other things, Duca's increasing liabilities theory is merely an "alternate measure of damages." ECF No. 146 at 17.

But for the same reason Duca's declining net worth theory navigates the reliability challenges, his increasing liabilities theory runs ashore on those challenges.  Specifically, his increasing liabilities theory is unreliable because it offers only half the picture of Island Air's declining financial health—its increase in uncollectable liabilities *but not* its needless dissipation of assets—and because that half picture is more tailored to the harms suffered by Island Air's creditors than to the harms suffered by the entire corporate body.  Island Air was harmed by the combination of the increase in liabilities and the dissipation of assets.  Looking at just the liabilities side focuses too much on the creditors' harm, which can overlap with the corporation's harm, *see supra* Part III.A.2, but should nevertheless not be the focus of a damages theory on a claim brought by the Trustee.

Also, focusing on just the liabilities side increases the likelihood of discrete error in quantifying the harm to Island Air:  for example, if Island Air incurred

loan debt near the end of the relevant damages period, that debt would increase liabilities and thus damages, but it would not have caused significant harm to Island Air because the cash received on the loan would likely still be in Island Air's coffers.

Duca does little to rebut those concerns, instead conceding that his increasing liabilities theory is less preferred than his declining net worth theory. *See* Duca's Supp. Report, ECF No. 133-3 at 4; *see also* ECF No. 146 at 17 (Plaintiffs admitting that the increasing liabilities theory is "not [Duca's] preferred measure").

Accordingly, because the Court is not satisfied with Duca's explanation for his increasing liabilities theory of damages, the Court does not find that theory to have an acceptable error rate.  Duca's increasing liabilities theory is therefore unreliable under FRE 702 and *Daubert*.  Defendants' requests to exclude Duca's testimony on that theory are granted.

## IV.   CONCLUSION

For the foregoing reasons, the Court GRANTS Defendants' Motions to Exclude, ECF Nos. 133 and 136, with respect to Duca's damages theory of increasing liabilities, and DENIES the Motions with respect to Duca's damages theory of declining net worth.  The Court also GRANTS in part and DENIES in

part the identical motions filed in Case No. 20-00246 JAO-RT, ECF Nos. 134 and 137.

IT IS SO ORDERED.

DATED: Honolulu, Hawaiʻi, May 3, 2023.

Jill A. Otake
United States District Judge

CIV. NO. 19-00574 JAO-RT, *Kane v. PaCap Aviation Fin., LLC*; CIV. NO. 20-00246 JAO-RT, *In re Hawaii Island Air, Inc.*; Order Granting in Part and Denying in Part Defendants' Motions to Exclude the Expert Testimony of James Duca, ECF Nos. 133 and 126

55